## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| JAMES JOHN RUD and BRIAN KEITH HAUSFELD, *on behalf of themselves and all others similarly situated*, | Civil No. 23-0486 (JRT/LIB) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION** |
| NANCY JOHNSTON, *Executive Director, Minnesota Sex Offender Program, in official capacity*, and JODI HARPSTEAD, *Department of Human Services Commissioner, in official capacity*, | |
| Defendants. | |

Anthony Stauber, Daniel E. Gustafson, David A. Goodwin, and Joseph Nelson, **GUSTAFSON GLUEK PLLC,** 120 South Sixth Street, Suite 2600, Minneapolis, MN 55402, for Plaintiffs.

Aaron Winter, Emily Beth Anderson, and Gabriel Richard Ulman, **OFFICE OF THE MINNESOTA ATTORNEY GENERAL**, 445 Minnesota Street, Suite 1400, Saint Paul, MN 55101, for Defendants.

Plaintiffs represent a class of individuals civilly committed to the Minnesota Sex Offender Program ("MSOP") who were approved for transfer to the lower-security Community Preparation Services ("CPS") facility in St. Peter—one of two facilities where MSOP patients can complete the final phase of their MSOP treatment. Plaintiffs either await transfer or their transfer was substantially delayed because the CPS facility does not have capacity for them due to bed and staffing shortages. Plaintiffs bring official

capacity claims against the Executive Director of the MSOP and the Department of Human Services Commissioner, arguing that they violated Plaintiffs' and class members' rights by failing to transfer them to CPS facilities when ordered to do so. Plaintiff James John Rud is awaiting transfer and filed a motion for temporary restraining order ("TRO") or preliminary injunction enjoining Defendants from ignoring their statutory duties and compelling Defendants to effectuate his transfer order. Because the Court finds that Plaintiffs are likely to succeed on their procedural due process claim and Rud satisfies the other requirements for preliminary injunctive relief, the Court will grant his motion and issue a preliminary injunction ordering Defendants to transfer Rud to CPS.

## BACKGROUND

### I.   FACTS

The Minnesota Commitment and Treatment Act, Minn. Stat. §§ 253D.01–.36, provides grounds for individuals to be civilly committed to the Minnesota Sex Offender Program ("MSOP"). (Compl. ¶ 8, Mar. 1, 2023, Docket No. 1-1.) MSOP patients are committed for an indeterminate period under Minn. Stat. § 253D.07, subds. 3, 4. (*Id.*) They are considered within the care and custody of the Minnesota Department of Human Services ("DHS"). (*Id.* ¶ 2.) Defendant Nancy Johnston is the Executive Director of the MSOP, and Defendant Jodi Harpstead is the Commissioner of the DHS. (*Id.* ¶¶ 4–5.)

A.   **MSOP Facilities**

Because the goal of the MSOP is to treat and safely reintegrate committed individuals back into the community, the MSOP is required to enable patients to progress towards "rendering further supervision unnecessary." (*Id.* ¶ 9.)  Minn. Stat. ¶ 253B.03, subd. 7.  Treatment of MSOP patients is structured into three phases.  (Compl. ¶ 11.)  In Phase I, patients focus on their ability to maintain behavior control, to successfully conform to the rules of the program, and to recognize that they have a problem that needs to be addressed in sex offender specific treatment.  (Decl. Jannine Hébert ("Hébert Decl.") ¶ 5, Mar. 13, 2023, Docket No. 31.)  Phase II then explores the underlying issues involved in the patients' patterns of sexually abusive behavior, including developing a history of their past offenses and contributing factors, and developing strategies to manage the behaviors, thoughts, and emotions that contribute to their offense patterns. (*Id.* ¶ 6.)  In Phase III, patients focus on demonstrating and maintaining meaningful change while developing reintegration skills.  (*Id.* ¶ 7.)  Many individuals in Phase III participate in community outings.  (*Id.*)

Patients in Phase I and patients refusing treatment are housed at the high-security facilities in Moose Lake.  (*Id.* ¶ 5.)  Patients in Phase II may reside at the Moose Lake facilities or at the secure and fenced-in facility in St. Peter.  (*Id.* ¶ 6.)  A few patients in Phase II reside at the less restrictive, residential environment of the Community Preparation Services facility (CPS) in St. Peter.  (*Id.*)  Phase III is completed in either the secure and fenced-in St. Peter facility or at CPS.  (*Id.* ¶ 7.)  Patients must complete all three

phases to be eligible for discharge from the MSOP.  (Compl. ¶ 14.)  However, there is no specific requirement that MSOP patients reside in CPS to be eligible for provisional discharge or discharge.

The CPS facilities are different from the secure facility in St. Peter and the high-security facility in Moose Lake because they are outside of a secured perimeter.  (Compl. ¶ 12.)  Transfer to CPS is statutorily designated as a "reduction in custody," and CPS facilities are "designed to assist civilly committed sex offenders in developing the appropriate skills and resources necessary for an eventual successful reintegration into a community." (*Id.* ¶ 13.)  Minn. Stat. §§ 246B.01, subd. 2a; 253D.27, subd. 1(b).

Both CPS and the secure facility in St. Peter have limited capacity.  (Compl. ¶ 12.)  Because the MSOP is operated by DHS, legislative approval is required to expand CPS, and DHS cannot shift funds from other parts of its budget to pay for additional beds at CPS.  Minn. Stat. § 16A.139(a).  (*See also* Decl. Nancy Johnston ("Johnston Decl.") ¶ 8, Mar. 13, 2023, Docket No. 29.)   In the beginning of 2011, only 6 patients were living at CPS, and capacity was expanded from 8 to 23 beds by the end of the year.  (*Id.* ¶ 9.)  The state legislature approved additional funding during the 2014 legislative session, increasing capacity to 89 beds.  (*Id.*)  The MSOP sought more funding from the legislature to expand CPS in 2017, but the request was denied.  (*Id.* ¶ 10.)  By 2018, there were 30 patients on the CPS waitlist.  (*Id.* ¶ 11.)  That number grew to 42 by 2020.  (*Id.* ¶ 13.)  The state legislature finally approved a CPS expansion in 2020, expanding capacity by 20 beds—

which are now filled.  (*Id.* ¶ 14.)  This year, DHS submitted an additional request to the legislature to increase CPS capacity, which is still pending.  (*Id.* ¶ 17.)  DHS was also able to expand the number of beds at CPS by "taking over" an unoccupied building on the St. Peter campus.  (*Id.* ¶ 18.)

As of March 10, 2023, CPS has 145 total beds.  (*Id.* ¶ 19.)  However, there are only 130 patients housed in CPS due to staffing shortages.  (*Id.*)  The MSOP is designed for an 8:1 ratio of patients to therapists.  (Hébert Decl. ¶ 12.)  This ratio exists to ensure therapists can provide quality treatment within professional ethics and best practices while meeting the documentation requirements for the MSOP's licensure.  (*Id.*)  The MSOP has had little success in hiring additional employees.  (Johnston Decl. ¶¶ 20–23.) It has undertaken extensive recruitment efforts and expanded employee benefits, but it does not have the authority to increase employee salaries.  (*See generally id.*)  *See also* Minn. Stat. § 43A.17.

According to the MSOP, increasing the patient to staff ratio at CPS would have negative consequences for MSOP staff, patients, and the people of Minnesota.  (Johnston Decl. ¶ 25.)  Patients would not receive treatment at the frequency and intensity of their individual needs, therapists' ability to run group therapy sessions and have individual contact with each patient would be limited, and there would likely be a lack of resources to allow for reintegration outings in the community.  (*Id.*)  There is a risk that patients could require time to complete their treatment programs, which could lead to "increased

hopelessness" due to lack of progression.  (*Id.*)  Increasing capacity might also decrease staff morale, which could lead more staff to leave the MSOP, and put the MSOP out of compliance with licensing requirements and state regulations.  (*Id.* ¶¶ 27–28.)

### B.    Transfer Between Facilities

To move from Moose Lake or the secure St. Peter facility to CPS, MSOP patients must be approved for a reduction in custody.  MSOP patients or the MSOP Executive Director may petition for a reduction in custody, including a provisional discharge, discharge from commitment, or transfer out of a secure treatment facility.  (Compl. ¶ 15.) Minn. Stat. § 253D.27, subd. 2.  A Special Review Board ("SRB") reviews petitions pursuant to Minn. Stat. §§ 253D.04, 253B.22.  (Compl. ¶ 15.)  The SRB holds a hearing on the petition, analyzes it in light of five statutory-defined factors, and then issues a report to the Commitment Appeal Panel ("CAP") recommending approval or denial of the petition. (*Id.*)  Minn. Stat. §§ 253D.27, subds 3, 4.  Only the CAP has authority to authorize reductions in custody.  (Compl. ¶ 15.)  MSOP patients, the DHS Commissioners, and limited other individuals can petition the CAP for reconsideration of an SRB recommendation.  (*Id.* ¶ 16.)  If no petition is filed, then CAP can either adopt the SRB recommendations or set a hearing date to discuss the petition and consider evidence on the matter.  (*Id.*)  Minn. Stat. § 263D.28, subd. 2(e).  CAP decisions may be appealed to the Minnesota Court of Appeals, but CAP decisions become effective after fifteen days if an appeal is not filed.  (Compl. ¶ 17.)  Minn. Stat. §§ 253D.28, subds. 3, 4.

Plaintiffs John James Rud and Brian Keith Hausfeld are both civilly committed to the MSOP. (Compl. ¶¶ 2–3.) Both Rud and Hausfeld petitioned and were recommended by the SRB and approved by the CAP for transfer from Moose Lake to CPS. (*Id.*) Rud's transfer was effective June 6, 2022, but, to date, he has not been transferred to CPS. (Compl. ¶ 20.) Hausfeld's approval was effective February 9, 2022, but he was not actually transferred until more than nine months later. (*Id.* ¶¶ 22–23.) While waiting for his transfer, Hausfeld was assaulted by another MSOP patient, causing substantial bodily harm as well as mental and emotional distress. (*Id.* ¶ 23.)

## II.    PROCEDURAL HISTORY

Together, Rud and Hausfeld represent two putative classes: (1) a class of MSOP patients who have received transfer orders but have not yet been transferred to less restrictive facilities (the "Awaiting Transfer Class"); and (2) a class of MSOP patients who received transfer orders to less restrictive facilities and who were transferred, but whose transfer was delayed (the "Delayed Transfer Class"). (*Id.* ¶ 25.) As of March 13, 2023, there are 16 patients with active transfer orders on the CPS waitlist. (Johnston Decl. ¶ 29.)

Plaintiffs filed this action in state court, and it was removed to the Court on March 1, 2023. (Notice of Removal, Mar. 1, 2023, Docket No. 1.) Plaintiffs petition the Court for a writ of mandamus ordering Defendants to immediately comply with all effective CAP orders and to transfer Plaintiffs and class members pursuant to those orders. (Compl. ¶¶ 34–40.) Plaintiffs also bring two claims for violation of federal and state procedural due

process protections, and one claim for violation of federal and state substantive due process protections.  (*Id.* ¶¶ 41–69.)

On March 6, 2023, Rud filed a Motion for Temporary Restraining Order ("TRO") or Preliminary Injunction.  (Mot. TRO or Preliminary Injunction, Mar. 6, 2023, Docket No. 9.) Rud urges the Court to grant a TRO pursuant to Federal Rule of Civil Procedure 65(b) or, in the alternative, a preliminary injunction pursuant to 65(a), compelling Defendants to effectuate his CAP transfer order.  (Pl.'s Mem. Supp. TRO at 1, Mar. 6, 2023, Docket No. 11.)  Defendants oppose Rud's motion.  (Defs.' Mem. Opp. Mot., Mar. 13, 2023, Docket No. 27.)

## DISCUSSION

### I.   STANDARD OF REVIEW

Courts evaluating a motion for a TRO or preliminary injunctive relief weigh four factors, commonly referred to in the Eighth Circuit as the *Dataphase* factors: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  The party seeking injunctive relief bears the burden of proving all *Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

When applying these factors, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc*., 182 F.3d 598, 601 (8th Cir. 1999) (quoting *United Indus. Corp. v. Clorox Co*., 140 F.3d 1175, 1179 (8th Cir. 1998)).  That said, "injunctive relief is an extraordinary remedy and the movant has the burden of establishing the propriety of an injunction."  *Watts v. Fed. Home Loan Mortg. Corp*., No. 12-692, 2012 WL 1901304, at *3 (D. Minn. May 25, 2012).

## II.   ANALYSIS

### C.   Evidence

As a preliminary matter, Defendants argue that Rud's motion should be denied because Rud has presented no evidence in support of his motion.  The burden is on the party seeking preliminary injunctive relief to prove each of the *Dataphase* factors. *Watkins*, 346 F.3d at 844.  Though the Eighth Circuit has not explicitly required sworn affidavits in support of motions for TROs or preliminary injunctions, other courts have held that the party seeking injunctive relief must present evidence beyond allegations in the complaint.  *See e.g., Palmer v. Braun*, 155 F. Supp. 2d 1327, 1331 (M.D. Fla. 2001), *aff'd*, 287 F.3d 1325 (11th Cir. 2002) ("To carry its burden, a plaintiff seeking a preliminary injunction must offer proof beyond unverified allegations in the pleadings."); *see also* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2949 ("Evidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support or oppose a motion for a preliminary injunction.  Affidavits are

appropriate on a preliminary-injunction motion and typically will be offered by both parties.").

Rud has put forth sufficient evidence for the Court to consider his present motion. Plaintiffs submitted many exhibits with orders and filings in similar cases. (Decl. Daniel E. Gustafson Supp. Pl.'s Mot. ("Gustafson Decl."); Mar. 6, 2023, Docket No. 12.) These include, among other items: a Minnesota Commitment Appeal Panel's finding of fact that the MSOP failed to transfer a patient in accordance with an CAP order for transfer;[1] an affidavit from Nancy A. Johnston pertaining to the same decision;[2] an Appeal Panel decision finding the MSOP in contempt because it had the ability to comply with a patient's transfer order but exercised bad faith in failing to comply with the order;[3] and two Minnesota state trial court decisions finding that a patient adequately alleged a due process violation after the MSOP failed to transfer him, but ultimately dismissing the case because Defendants were entitled to qualified immunity.[4]

Further, Defendants' affidavits support the assertions set forth in Plaintiffs' complaint. The parties appear to agree upon the underlying facts. Though Rud did not submit any affidavits unique to this particular action, there is certainly enough evidence for the Court to properly analyze his request for preliminary injunction.

---

[1] (Gustafson Decl., Ex. A, at 2.)
[2] (Gustafson Decl., Ex. A, at 8.)
[3] (Gustafson Decl., Ex. B, at 19, 22.)
[4] (Gustafson Decl., Ex. C, at 26; Gustafson Decl., Ex. D, at 42.)

**D.**   ***Dataphase* Factors**

In deciding Rud's motion, the Court must ask if he has satisfied the *Dataphase* factors.  Each of the four factors will be analyzed in turn.

### 1.   Likelihood of Success on the Merits

First, Rud must show that he is likely to succeed on the merits.  "[A]n injunction cannot issue if there is no chance of success on the merits."  *Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005).  However, the question is not whether the movant has "prove[d] a greater than fifty per cent likelihood that [they] will prevail," *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007), but rather whether any of their claims provide a "fair ground for litigation."  *Watkins*, 346 F.3d at 844.  "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win."  *PCTV Gold*, 508 F.3d at 1143.  Rather, this factor simply requires the movant to show that they have a "fair chance of prevailing" on their claims.  *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).  Likelihood of success on the merits is often considered the most significant of the *Dataphase* factors.  *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).  The movant need only show likelihood of success on the merits of a single cause of action, rather than every cause of action they assert in their complaint.  *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742–43 (8th Cir. 2002).

Plaintiffs assert claims for federal and state substantive and procedural due process violations. The Court will first address the likelihood of success on the substantive due process claim then discuss procedural due process.

### a.      Substantive Due Process

On behalf of both putative classes, Plaintiffs bring a claim against Defendants for substantive due process violations under the Minnesota and United States Constitutions. Plaintiffs allege that they have a "liberty interest in the effectuation of the CAP transfer orders which provide them with access to treatment required for phase progression and are otherwise statutorily required." (Compl. ¶ 68.)

The Supreme Court has explained that the Constitution's Due Process Clause "guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997). "To establish a substantive due process violation, the plaintiff must demonstrate that a fundamental right was violated and that the defendant's conduct shocks the conscience." *Stockley v. Joyce*, 963 F.3d 809, 818 (8th Cir. 2020) (internal quotation omitted). A right is fundamental if it is, objectively, "deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 720–21. "Only in the rare situation when state action is truly egregious and extraordinary will a substantive due process claim arise." *Strutton v. Meade*, 668 F.3d 549, 557 (8th Cir. 2012) (quotation omitted). The due process protections provided under the Minnesota constitution are "identical to the due

process guaranteed under the Constitution of the United States." *State v. Holloway*, 916 N.W.2d 338, 344 (Minn. 2018) (internal quotation omitted).

The Eighth Circuit has found that MSOP patients' substantive due process rights are not violated by being civilly committed, provided they receive treatment while in the MSOP program. *See Karsjens v. Piper*, 845 F.3d 394, 409–11 (8th Cir 2017). *Cf. Van Orden v. Stringer*, 937 F.3d 1162, 1167 (8th Cir. 2019). But the Eighth Circuit has not suggested— and the Court does not find now—that the Plaintiffs' right to be transferred to CPS is a fundamental right protected by substantive due process. The right to be in a less-restrictive facility is generally not considered a fundamental right. *See Lelsz v. Kavanagh*, 807 F.2d 1243, 1247 n.5 (5th Cir. 1987) ("Circuits that have addressed this issue have all held that there is no constitutional or federal right to community placement, or care or treatment in the least restrictive environment.") (collecting cases).

Even if Plaintiffs' right to be transferred was a fundamental right, they have not shown that Defendants' conduct "shocks the conscience." Patients may still complete Phase III of the MSOP and be discharged without ever residing in CPS. Delaying patients' transfer due to practical staffing and physical capacity limitations does not constitute egregious or extraordinary state action. Accordingly, Rud has not shown that he is likely to succeed on the merits of the substantive due process claim.

### b.    Procedural Due Process

Plaintiffs also bring claims for procedural due process violations, asserting that they "had a protected liberty interest in being transferred to a less-restrictive

-13-

environment after receiving a judicial order for transfer."[5]  (Compl. ¶ 46.)  Rud has shown that Plaintiffs have a "fair chance of prevailing" on this claim.

"Due process is a flexible concept, requiring only 'such procedural protections as the particular situation demands.'"  *Clark v. Kan. City Mo. Sch. Dist.*, 375 F.3d 698, 702 (8th Cir. 2004) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)).  "To set forth a procedural due process violation, a plaintiff, first, must establish that [their] protected liberty or property interest is at stake."  *Schmidt v. Des Moines Pub. Schs.*, 655 F.3d 811, 817 (8th Cir. 2011) (quotation omitted).  "Second, the plaintiff must prove that the defendant deprived [them] of such an interest without due process of law."  *Id.*  Protected liberty interests may arise from two sources—the Due Process Clause itself and the laws of the States.  *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  Civilly detained people like MSOP patients retain protected liberty interests, though their liberties may be permissibly curtailed due to the circumstances of their confinement.  *See Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006).

---

[5] Plaintiffs bring a separate procedural due process claim on the grounds that residing at CPS is a necessary step towards discharge from the MSOP.  (Compl. ¶¶ 57–59.)  However, the record before the Court does not support that assertion.  There is no requirement that MSOP patients must reside in CPS to be eligible for provisional discharge or discharge, as Phase III is also available at the secured St. Peter facility.  (Hébert Decl. ¶ 7.)  *See e.g.*, *In re: Simpson*, Appeal Panel No. AP19-9032, Order ¶ 6 (Jan. 16, 2020) (granting provisional discharge for a MSOP patient who had been approved for transfer for CPS but was unable to be transferred due to a lack of vacancies at that facility).  This procedural due process claim is therefore unlikely to succeed on the merits and the Court will not analyze it in detail.

If a plaintiff is deprived of a protected liberty interest, the Court must then balance (1) the liberty interest at stake, (2) the risk of an erroneous deprivation of such interest through the procedures used, and (3) the government's interest in providing the process that it did, including the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews*, 424 U.S. at 335. The exact requirements for a process to constitute sufficient due process are flexible and specific to each particular situation. *Senty-Haugen*, 462 F.3d at 887–88. The most important mechanism for evaluating the process is whether the aggrieved party received notice of the factual bases for the deprivation of the right and a fair opportunity to rebut the decision. *Id.* at 888.

Here, Minnesota statutes give rise to a protected liberty interest: MSOP patients' right to be transferred to CPS within a reasonable time from when the CAP orders their transfer. The Minnesota Supreme Court recently considered this exact issue in *McDeid v. Johnston*, 984 N.W.2d 864 (Minn. 2023). There, the CAP ordered two MSOP patients be transferred to CPS. *Id.* at 870. The patients argued that defendants—the same Defendants as this action—violated their due process rights by delaying their transfer to CPS for over two years. *Id.*

The state district courts concluded that they had sufficiently pleaded a cause of action for due process violations: that the statutes governing the MSOP transfer procedures created a protected liberty interest in timely transfer to a less restrictive

facility upon issuance of a CAP transfer order; that MSOP officials violated that right when they failed to transfer the patients in a reasonable amount of time; and that patients were denied meaningful process or procedural protections to ensure timely or actual enforcement of the CAP order. *Id.* at 870–71. The district courts, however, ultimately dismissed the patients' cases because defendants were entitled to qualified immunity. *Id.* at 871. The Minnesota Court of Appeals affirmed the dismissal of their actions because the right to transfer within a reasonable time was not clearly established under the law, so qualified immunity barred their claims. *McDeid v. Johnston*, Nos. A21-0042, A21-0043, 2021 WL 3277218, at *4 (Minn. App. Aug. 2, 2021).

The Minnesota Supreme Court granted review on the sole issue decided by the court of appeals: whether the patients' right to timely implementation of the CAP transfer orders was clearly established. *McDeid*, 984 N.W.2d at 871. The Minnesota Supreme Court concluded that CAP transfer orders are "mandatory" and the MSOP staff "do not have discretion to ignore CAP transfer orders." *Id.* at 876–77. It reasoned that it was "clearly established that the Patients had a right to a transfer to CPS **within a reasonable time** following the final decision of the CAP that such a transfer was appropriate." *Id.* at 877 (emphasis in original). The Minnesota Supreme Court remanded to determine whether failure to transfer within a reasonable time following a CAP transfer order gives rise to a federal due process claim. *Id.* at 879.

*McDeid* establishes that once the CAP approves a patient's transfer, that patient has a right under Minnesota state law to be transferred within a reasonable time. The record before the Court indicates that the Defendants deprived Rud of that right by delaying his transfer for nine months, without providing him with meaningful procedures to protect that right and enforce his transfer.

Balancing (1) the liberty interest at stake, (2) the risk of an erroneous deprivation of such interest through the procedures used, and (3) the government's interest in providing the process that it did, as required by *Mathews*, 424 U.S. at 335, the Court finds that Rud is likely to succeed on the merits of his procedural due process claim. The MSOP certainly has an interest in delaying patients' transfer until it expands capacity and hires more staff. However, that interest does not outweigh Rud's interest in residing in a lower-security facility that focuses on treatment designed to prepare patients for life after discharge.

Defendants argue that Rud is unlikely to succeed on his procedural due process claim because there is no constitutionally protected liberty interest in transfer to CPS after a CAP order. But procedural due process casts a wider net. The Supreme Court has explained that protected liberty interests may arise under "the laws of the States"—as is the case here. *See Kentucky Dep't of Corr.*, 490 U.S. at 460. Defendants also assert that Rud is unlikely to succeed on this claim because it is not a procedural issue. But as Defendants admit, "procedural due process is only meant to protect a person from the

denial of **procedures** allowing him to contest the basis on which he has been deprived of a protected interest." (Defs.' Mem. Opp. Mot. at 27 (emphasis in original).) *See also Carey v. Piphus*, 435 U.S. 247, 259–60 (1978). And that is what seems to have happened here. Defendants have deprived Rud of his right to be transferred to CPS without any procedure. Rud has shown that Plaintiffs are likely to succeed on their procedural due process claim. Therefore, Rud has satisfied the first—and most significant—*Dataphase* factor.

### 2.     Irreparable Harm

The Court may now consider the remaining *Dataphase* factors, beginning with irreparable harm. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (internal quotation omitted).

Here, Rud has demonstrated that he is likely to suffer irreparable harm. There are resources available in CPS that patients otherwise lack. As Defendants admit, CPS "is a less-restrictive, unlocked residential setting on the grounds of MSOP's St. Peter campus, located outside the secure perimeter." (Johnston Decl. ¶ 4.) While "community outings are not guaranteed to a [patient] immediately upon his or her transfer to CPS," there is

little possibility of outings at the higher-security facilities. (*Id.*) CPS patients are "granted an increase in liberty," as demonstrated by the fact that 63% of Phase III patients at CPS participate in community outings. (Hébert Decl. ¶ 8.) Though patients are not required to reside in CPS to complete Phase III of their treatment, the community outings and less-restrictive environment available in CPS are designed to prepare MSOP patients for reintegration into society.

Defendants argue that Rud will not suffer irreparable injury because he has not yet been approved for community outings, so he will not enjoy that benefit of residing at CPS. But the fact that the CAP approved Rud for transfer suggests that he has made progress in the secured facility and would benefit from the less-restrictive environment offered at CPS. Further, it is not dispositive that Rud waited eight months from the date of his transfer to bring this motion, as the Minnesota Supreme Court only recently decided *McDeid.* Rud satisfies the irreparable harm requirement.

### 3. Balance Between Harm and Harm of Injunctive Relief

Next, the Court considers the balance of harms. "The balance-of-harms factor involves 'assess[ing] the harm the movant would suffer absent an injunction,' as well as the harm the other parties 'would experience if the injunction issued.'" *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1057 (D. Minn. 2019) (quoting *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015)).

As often occurs, the balance of harms factor does not particularly weigh in favor of either side. Rud has shown that he and other members of the Awaiting Transfer Class

continue to suffer harm the longer their transfers are delayed.  They have a right to be transferred to CPS and, given the rate at which new beds become available, some members of the Awaiting Transfer Class will likely not be transferred for well over a year.

Defendants argue that the MSOP will suffer great harm if the Court grants this request for preliminary injunction.   They assert that exceeding the physical and staffing capacity of CPS would have negative consequences for MSOP staff, patients, and the people of Minnesota.  For instance, patients may not be able to receive treatment at the frequency and intensity of their individual needs, and therapists' ability to run group therapy sessions could be limited.  Defendants also assert, without specifics, that there are security concerns with expanding beyond capacity.  There may also be a risk that the MSOP would be out of compliance with state regulations.

The harms Defendants assert do not outweigh the harm that Rud and other members of the Awaiting Transfer Class will experience if their transfers are further delayed.  Every day that they are not transferred, they lose out on the resources and less-restrictive environment available at CPS.  It is true that federal courts generally "are to give deference to state officials managing a secure facility, and [Minnesota Sex] Offender Program staff have a substantial interest in providing efficient procedures to address security issues." *Senty-Haugen*, 462 F.3d at 887.  But granting Rud's present motion would only marginally increase the population of CPS, thus not substantially disturbing the existing patient to staff ratio.  Defendants have also not identified any specific security

-20-

concerns.  Moreover, while Defendants assert that expanding the CPS population **may** put the MSOP out of compliance with state regulations, it has neither definitively stated nor shown that the MSOP **would** be out of compliance if the Court were to grant Rud's motion.  The balance of harms factor tips in favor of issuing a preliminary injunction.

### 4.   Public Interest

Lastly, the Court must consider the public interest.  There is great public interest in ensuring the MSOP follows the laws enacted by the Minnesota legislature.  By statute, the MSOP is required to transfer patients who have been approved for transfer to CPS by a CAP order.  As the Minnesota Supreme Court acknowledged in *McDeid*, this statutory provision is mandatory.  *McDeid*, 984 N.W.2d at 877.  "State officials do not have the discretion to ignore CAP transfer orders."  *Id.*  The MSOP has an obligation to transfer these patients, and it is in the public interest to enforce that obligation.

It is further in the public interest to allow patients like Rud who have been approved for CPS to be transferred there so they can receive the unique benefits CPS provides, such as a less-restrictive environment well-suited for preparing patients for reintegration into society.  Ultimately, residing at CPS will help patients with their therapeutic process and achieve the MSOP's purpose of safely reintegrating them back into the community.

In light of the foregoing, the Court finds that Rud has satisfied all four *Dataphase* factors.  The Court will therefore grant Rud a preliminary injunction and require the MSOP to transfer him to CPS.

###### E.       Bond

Federal Rule of Civil Procedure 65(c) states that the Court "may issue a preliminary injunction . . .  only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  "The amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion."  *Stockslager v. Carroll Elec. Co-op Corp.*, 528 F.2d 949, 951 (8th Cir. 1976).  Despite this significant discretion, the Eighth Circuit will reverse the district court "if it abuses that discretion due to some improper purpose, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determinations."  *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991).

There are few exceptions to Rule 65(c)'s bond requirement.  *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.,* 847 F.2d 100, 103 (3d Cir. 1988) ("While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory.").  Indeed, there are few examples in this circuit of courts waiving the bond requirement.  *See Curtis 1000, Inc. v. Youngblade,* 878 F. Supp. 1224, 1278 (N.D. Iowa 1995) ("Almost without exception, however, courts in this circuit have required a bond before issuing a preliminary injunction."); *Masterman ex rel. Coakley v. Goodno,* No. 03–2939, 2003 WL 22283375, at *1 (D. Minn. Sept. 25, 2003).  Courts in this district have waived the bond requirement in cases in which the defendant did not object to requiring no bond, *Fantasysrus 2, L.L.C. v. City of East Grand*

-22-

*Forks,* 881 F.Supp.2d 1024, 1033 (D. Minn. 2012), and in which the defendant had not shown that any damages would result from the wrongful issuance of an injunction, *Bukaka, Inc. v. Cnty. of Benton,* 852 F. Supp. 807, 813 (D. Minn. 1993).

Here, Defendants have neither shown that any damages would result from the wrongful issuance of an injunction nor sought a bond. In fact, neither side even raised the issue. *See Northshor Experience Inc. v. Duluth,* 442 F. Supp. 2d 713, 723 (D. Minn. 2006) (waiving the bond requirement when the defendant had not objected to the waiver or otherwise "addressed this issue or attempted to quantify any dollar amount of harm that it may face from a wrongly issued injunction"). CPS already has open beds that Rud could occupy, and Defendants would likely not sustain any monetary damages if they have been found to be wrongfully enjoined. The Court will therefore waive the Rule 65(c) security requirement.

## CONCLUSION

Rud has shown that he is likely to succeed on the procedural due process claim because he had a right to be transferred to CPS within a reasonable time from when the CAP order became effective, and Defendants deprived him of that right without process. Rud also satisfies the remaining *Dataphase* requirements. Accordingly, the Court will grant Rud a preliminary injunction. Because the Court has not yet issued an order certifying the Plaintiffs' requested classes, this preliminary injunction will only apply to

-23-

Rud, rather than the entire Awaiting Transfer Class.  Defendants must transfer Rud to CPS pursuant to his CAP order within fifteen days from the date of this Order.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Temporary Restraining Order or Preliminary Injunction [Docket No. 9] is **GRANTED**;

2. The security requirement of Federal Rule of Civil Procedure 65(c) is waived;

3. Defendants must transfer Plaintiff James John Rud to Community Preparation Services pursuant to his Commitment Appeal Panel transfer order within 15 days from the date of this Order; and

4. This Order is effective upon the date recited below and shall remain in effect until this action is terminated, or until otherwise ordered by the Court.

DATED:  March 22, 2023
at Minneapolis, Minnesota.

          JOHN R. TUNHEIM
      United States District Judge