UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| James John Rud, et al., | Civil Case No. 23-cv-486 (JRT-LIB) |
| Plaintiffs, | |
| vs. | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EVIDENTIARY HEARING** |
| Nancy Johnston, et al., | |
| Defendants. | |

## INTRODUCTION

Once more, Plaintiffs ask this Court to disturb the exercise of state-law granted discretion by seeking an immediate injunction forcing Defendants to transfer four individuals to Community Preparation Services ("CPS"), a non-secure Minnesota Sex Offender Program ("MSOP") facility. All parties and this Court are aware of Defendants' strenuous efforts to balance the needs of MSOP clients with existing funding and staffing shortfalls. But even if the balance of harms did not foreclose granting Plaintiffs' motion, they are not likely to succeed on the merits of their claims, which (as further detailed in Defendants' recently filed motion to dismiss) are fatally flawed and rely on an erroneous understanding of due process and mandamus.

Additionally, the Court has adequate documentary evidence on which to base a conclusion as to what procedure, if any, Plaintiffs are entitled to under their procedural due process claim. This purely legal issue does not benefit from further factual development, particularly since Plaintiffs do not contradict the written evidence. Plaintiffs' request for

an evidentiary hearing appears to be an attempt to circumvent Magistrate Judge Brisbois'
current stay on discovery, considering the evidence they purport to establish at the hearing
are facts already established through Defendants' submitted declarations.  For these
reasons, Defendants respectfully ask the Court to deny Plaintiffs' request for a preliminary
injunction and rule on the present motion based on the submitted, uncontroverted
affidavits.

## FACTUAL AND PROCEDURAL BACKGROUND

The Court is aware of the general factual background that underlies this case.
*See, e.g.,* Docs. 23, 27, 29, 31, 73, & 96.  It is briefly recounted below for clarity on the
present motion.

## I.     MSOP'S STRUCTURE, TREATMENT PROGRAM AND OVERALL STRUCTURE.

MSOP provides sex offender treatment to individuals who have been civilly
committed by Minnesota courts as sexually dangerous persons or sexual psychopathic
personalities.  Minn. Stat. §§ 246B.02; 253D.02, subds. 15-16.  MSOP operates two secure
treatment facilities in Moose Lake and St. Peter, and one non-secure treatment facility in
St. Peter called CPS.   Minn. Stat. §§ 253D.02, subd. 13, 246B.01, subd. 2a; Doc. 29,
Declaration of Nancy Johnston (Johnston I, Decl.) ¶ 4.   MSOP is led by its Executive
Director, Nancy Johnston, and DHS Commissioner Jodi Harpstead exercises ultimate
authority over MSOP (and all DHS programs).   Minn. Stat. § 246B.01, subd. 2c;
Johnston I, Decl. ¶ 1; Minn. Stat. § 246B.02.

In addition to providing treatment, DHS adopts rules to govern the operation,
maintenance, and licensure of facilities operated by MSOP.  Minn. Stat. § 246B.04,

subd. 1; Minn. R. 9515.3000 to 9515.3110.   Among other things, MSOP "must provide qualified treatment and treatment support staff in numbers sufficient to meet [its] responsibilities for evaluation and assessment, developing and implementing individualized treatment plans, providing a secure and orderly environment, and planning for discharge."   Minn. R. 9515.3050, subp. 2; *see also* Minn. R. 9515.3050, subp. 3. Additionally, each MSOP facility is subject to licensing under the Minnesota Department of Health as a Supervised Living Facility, subject to approved waivers.   Johnston I, Decl. ¶ 28; Minn. R. ch. 4665.   Each facility is also subject to physical space requirements, including minimum acceptable spaces, bedroom sizes, and water closet, lavatory, and bathing accommodations.   Johnston I, Decl. ¶ 28.[1]

### A.   MSOP's Three-Phase Treatment Program.

Consistent with current research on risk, sex offense specific treatment, standard practice in the field, and professional literature, MSOP operates as a three-phase program. Doc. 31, Declaration of Jannine Hébert (Hébert Decl.) ¶ 4.   Clients reside in either the Moose Lake facility, the secure facility in St. Peter, or CPS.   Hébert Decl. ¶¶ 5-7.

No matter where a client is located (CPS or in the secure perimeter), treatment is based on that client's individual needs as determined by their clinical team.   Hébert Decl. ¶ 9.   This includes supervised community outings, which are just one reintegration opportunity typically utilized by clients in the later CPS stages.   *Id.*   But such outings are

---

[1] Each MSOP facility is subject to the standards of the Minnesota State Fire Marshal, the Minnesota Food Code (Minn. Rule ch. 4626), and the Minnesota Occupational Safety and Health Administration (OSHA).   Johnston I, Decl. ¶ 27.

not presumptively available to any client at CPS, nor are community outings blanketly prohibited for clients located in the secure perimeter. *Id.* Community outings are entirely clinical decisions based on the individual client's treatment needs and progress; location at CPS or phase determination alone is not a sufficient precondition for utilizing community outings. *Id.*

**B.     Community Preparation Services.**

CPS is not a phase of treatment, it is a location. Hébert Decl. ¶ 8. Transfer to CPS is considered a reduction in custody that can only be authorized by the CAP upon a client showing that they meet the statutory criteria applicable to transfer. Minn. Stat. § 253D.29; *see also* Minn. Stat. § 253D.02, subd. 13 (defining "secure treatment facility" to *exclude* non-secure MSOP programs operated outside a secure environment). All clients at CPS continue to address their treatment needs consistent with the MSOP treatment program design. Hébert Decl. ¶ 8. Clients located at CPS are in a variety of treatment phases. *Id.,* ¶ 14. And some, but not all, CPS clients in both Phase II and Phase III participate in off-campus clinical outings. *Id.* Whether a client at CPS is approved for off-campus clinical outings is determined wholly by the recommendations of the client's treatment team. *Id.*, ¶ 9.

CPS has expanded to include 145 total beds. Updated Declaration of Nancy Johnston ("Johnston II, Decl."), ¶ 4. However, despite MSOP's good faith efforts, CPS is not currently fully staffed. *Id.* For example, MSOP has funding to support 17 primary therapists on staff at CPS, and currently only 11 of these positions are filled. *Id.* Additionally, MSOP has funding to support 70 security positions at CPS, and currently

only 64 of these positions are filled. *Id.* So even though there are 145 *beds*, CPS currently only has sufficient clinical and other staff to support and house 130 *clients*. *Id.* The 15 currently unoccupied beds can and will be assigned as soon as the necessary additional staff can be recruited, hired, and trained. *Id.*

Clients on the CPS waitlist are transferred to CPS once a staffed bed becomes available. Johnston II, Decl. ¶ 5. It typically takes no more than two days to transfer a client from the secure perimeter to CPS once a staffed CPS bed becomes available. *Id.*

**C.   Provisional And Full Discharge.**

As with transfer to CPS, clients seeking a provisional or full discharge from MSOP must petition the SRB and, ultimately, the CAP for approval. Clients at any phase of treatment may petition for provisional or full discharge, and the CAP has the sole authority to grant provisional or full discharge based on statutory factors or constitutional requirements. Minn. Stat. §§ 253D.27., 30-.31 (setting forth statutory factors for provisional and full discharge, none of which are limited to clients at certain phases of treatment or residences); *Call v. Gomez*, 535 N.W.2d 312, 319 (Minn. 1995) (commitment can only continue if it bears a reasonable relation to the reason for commitment, i.e., for so long as the client needs further inpatient treatment for a sexual disorder and continues to pose a danger to the public).

There is no requirement that MSOP clients reside in CPS to be eligible for provisional discharge or discharge, and individuals who never resided at CPS have been provisionally discharged or discharged from MSOP. *See, e.g.*, *In re: Braylock*, Appeal Panel No. AP15-9038, Order (Aug. 21, 2015); *In re: Breland*, Appeal Panel

5

No. AP15-9054, Order (Sept. 16, 2016); *In re: Mathews*, Appeal Panel No. AP15-9035, Order (Sept. 16, 2016); *In re: Barth*, Appeal Panel No. AP15-9061 (Oct. 17, 2017); *In re: Rask*, Appeal Panel No. AP17-9018, Order (June 25, 2018); *In re: Bolte*, Appeal Panel No. AP17-9007, Orders (June 29, 2018 and Feb. 19, 2019); *In re: Swedeen*, Appeal Panel No. AP18-9128, Order (July 24, 2019); *In re: Trosen*, Appeal Panel No. AP19-9081, Order (Jan. 3, 2020); *In re: Simpson*, Appeal Panel No. AP19-9032, Order (Jan. 16, 2020); *In re: Bailey*, Appeal Panel No. AP20-9019 (Dec. 14, 2020); *In re: Coon*, Appeal Panel No. AP20-9001, Order (May 17, 2021); *In re: Uselman*, Appeal Panel No. AP20-9027 (Sept. 8, 2021).

## II.   EXPANSION OF CPS.

### A.   Expanding CPS Requires Legislative Approval.

Additional beds have been necessary at CPS to keep up with a significant increase in CAP orders granting clients transfer to CPS.  Johnston I, Decl. ¶ 7.  But expanding the physical capacity of CPS generally requires approval from the Minnesota legislature.  *Id.* DHS cannot shift funds from other parts of its budget to instead pay for additional beds at CPS.  *Id.,* ¶ 8.  Minnesota Statutes section 16A.139 prohibits state officials from using money appropriated by law for a purpose other than the purpose for which the money was appropriated.  The appropriations DHS receives for its Direct Care and Treatment programs are for program operations, and not for the construction of new buildings.  Johnston I, Decl. ¶ 8.  And while the issuance of general obligation bonds may not be the only mechanism through which the legislature can fund the construction of new buildings, nearly all of the other options (general fund appropriations, revenue bonds, agency appropriation bonds,

state appropriate bonds, lease revenue bonds, etc.) require legislative action and approval. *Id.*

**B.   MSOP's Recent Efforts To Expand CPS's Physical Footprint.**

In the 2023 legislative session, DHS submitted a bonding request to the legislature that was passed by both chambers and later approved by the Governor on June 1, 2023. Johnston II, Decl. ¶ 7. This long-awaited bill provided funds to design, renovate, construct and furnish construction at CPS. *Id.* With the recent grant of $21 million, DHS expects physical CPS capacity to increase to a total of 175 beds. *Id.*

**C.   MSOP's Efforts To Fully Staff CPS.**

A major constraint on DHS's ability to expand capacity at CPS is staffing requirements. Despite MSOP's good faith efforts, CPS is not currently fully staffed. Johnston Decl. ¶ 19. So even though there are 145 CPS *beds*, CPS currently only has sufficient clinical and other staff to support 130 CPS *clients* within MSOP's best-practice informed 8:1 client to staff ratio. Johnston II, Decl. ¶ 4; Hébert Decl. ¶ 12.

MSOP has spent significant energy into its hiring efforts. DHS, through its Direct Care and Treatment ("DCT") division, posts MSOP's job vacancies on the State's career website (https://careers.mn.gov/), and these job postings are then cross-posted to more than 85 other career and recruitment websites, including diversity recruitment websites. DHS posts job openings on social media platforms (such as Facebook). Johnston I, Decl. ¶ 20. MSOP sends out emails to jobseekers on LinkedIn regarding its open positions. *Id.* MSOP trawls job boards to engage in individualized and direct sourcing of candidates for certain specifically-tailored jobs. *Id.* DCT similarly both attends multi-employer job fairs and

holds its own stand-alone job fairs.  *Id.*  In some instances, MSOP advertises in local newspapers and on local radio stations to promote its job fairs and employment opportunities.  *Id.*  MSOP also creates and utilizes modernized advertisement to attract qualified candidates internally and externally.  *Id.*

DCT partners with colleges and universities to make sure new graduates are aware of MSOP's employment opportunities.  Johnston I, Decl. ¶ 21.  DCT attends school career fairs, posts jobs on internal school job boards, puts up flyers at institutions, and sends hiring managers to attend school meetings as "Employers of the Day" to talk to students about job opportunities.  *Id.*  In addition, DCT has implemented a "Career Readiness Program" where its hiring supervisors partner with various schools to help graduates prepare for job interviews, as well as discuss its own job openings.  *Id.*

Unfortunately, MSOP cannot solve its staffing shortage by just throwing money at the problem.  MSOP employee salaries are subject to the statutory limits set forth in Minn. Stat. § 43A.17.  Johnston I, Decl. ¶ 22.  Staff salaries and salary ranges are negotiated with the collective bargaining units that represent state employees (for example, most MSOP staff are covered by AFSCME or MAPE, which have their contracts renegotiated every two years).  *Id.* Additionally, Minnesota Management and Budget may also move groups of employees (i.e., job classifications) from one negotiated salary range to another with notification to the union.  *Id.*  But MSOP does not have the ultimate authority to raise staff salaries on its own.  *Id.*

Working within these limitations, MSOP has been offering other benefits to new and existing employees, including eligibility for student loan and tuition reimbursement,

as well as signing bonuses (the amount of which is dependent on the specific job, but can be thousands of dollars).  Johnston I, Decl. ¶ 23.

### D. Current And Ongoing Consequences Of Exceeing CPS's Current Physical Capacity And Staffing Ratios.

Though MSOP has put significant effort into obtaining funding for additional physical space and into hiring additional employees, CPS today has insufficient staff and space to house more than 130 clients.  Johnston II, Decl. ¶ 4.  And there are significant statutory, regulatory, and practical concerns that preclude CPS from housing more than 130 clients with its current limited resources.  *Id.*

First, health and management concerns require a certain minimum number of staff per CPS client that currently cannot be met.  Johnston I, Decl. ¶ 25.  Permitting additional clients to be housed at CPS would exceed the current physical and staffing capacity of CPS and has negative consequences for MSOP staff, clients, and the State.  *Id.*  For example, insufficient staffing limits clients' ability to receive treatment at the frequency and intensity of their individual needs.  *Id.*  Exceeding the physical and/or staffing capacity at CPS also negatively impacts the ability of primary therapists to run group therapy sessions, and results in a reduction in the contact each client has with his or her assigned therapist.  *Id.*; Hébert Decl. ¶ 12.  Insufficient staffing can lead to a lack of resources to allow for reintegration outings in the community.  Johnston I, Decl. ¶ 25.  Clients could take more time to complete their treatment programming, which could lead to increased hopelessness in clients due to lack of progression.  *Id.*

Additionally, MSOP is a stressful and intense environment for staff.  Hébert Decl. ¶ 12.  Keeping clinical caseloads as a reasonable level supports staff in managing the inherent stress and pressure of their jobs.  *Id.*  Currently, those levels are exceeded, and staff are under increased pressure, which negatively impacts morale.  Johnston I, Decl. ¶ 27.  This would likely cause staff to leave their jobs, which would then put additional pressure on the remaining staff, leading to perpetual cycle of attrition.  *Id.*

Exceeding CPS's clinical staffing ratio also results in fewer clinical eyes on each client, meaning MSOP would be less aware of any potential behavior or treatment problems that a client may be experiencing.  Hébert Decl. ¶¶ 15-16.  This is especially problematic at CPS, which – for many MSOP clients – is the first time clients have been in unsecure, less-institutional settings in decades.  *Id.* ¶ 16.  Less available treatment and clinical attention for clients being newly de-institutionalized for the first time in decades would likely lead to treatment delays or regression in many clients and could lead to significant behavioral concerns that could negatively impact security at CPS and, accordingly, public safety.  *Id.* ¶ 17.

Not only could MSOP face the imposition of escalating fines or the closure of non-compliant spaces, but MSOP would also suffer blows to the program's credibility and its overall integrity.  *Id.*  Staff would be under increased pressure, which would negatively impact morale.  *Id.*  In MSOP's experience, this increased stress can lead staff to leave their jobs, which then puts additional pressure on remaining staff, leading to vicious cycle of attrition.  *Id.*

E.      **Current CPS Waitlist**

There is currently a list of clients with orders authorizing transfer waiting to be moved into CPS when a bed becomes available.  Johnston I, Decl. ¶ 30.  As of January 24, 2024, there are 16 clients on the CPS waitlist.  Johnston II, Decl., ¶ 6.  Beds become available when a client at CPS is provisionally discharged into the community or when a client at CPS is revoked back to the secure perimeter because of behavioral issues or treatment regression.  Johnston I, Decl. ¶ 30.

III.   **THE PRESENT CASE.**

A.      **The March 22, 2023 Order Granting Plaintiff Rud's Motion For A Preliminary Injunction.**

In the order granting Plaintiff Rud's motion for a preliminary injunction (ECF No. 35), this court found that Rud was likely to succeed on one procedural due process claim – that he has a "protective liberty interest in being transferred to a less-restrictive environment after receiving a judicial order for transfer."  ECF No. 35 at 13-18.  In doing so, this Court acknowledged that Defendants are only required to effectuate a transfer order "within a reasonable time" (*id.* at 17), but then held that Rud was "deprived [] of that right without process."  *Id.* at 24.

This Court relied heavily on *McDeid v. Johnston*, 984 N.W.2d 864 (Minn. 2023), holding that *McDeid* established that Rud had "a right under Minnesota state law to be transferred within a reasonable time."  *Id.* at 17.  This Court also acknowledged, correctly, that the Minnesota Supreme Court did *not* find that this gave rise to a federal due process right.  *Id.* at 16; *McDeid*, 984 N.W.2d at 879 ("We remand to the court of appeals to address

whether the State Officials' clear obligation to transfer the Patients to CPS within a reasonable time following a CAP transfer order gives rise to a federal due process right.").

Despite undisputed evidence detailing the resource limitations, this court held that the delay was not reasonable and that granting Rud's motion "would only marginally increase the population of CPS, thus not substantially disturbing the existing patient to staff ratio." *Id.* at 20. This Court ordered Rud's transfer to CPS within 15 days of the Order, to which Defendants appealed on March 24, 2023. The Eighth Circuit granted a temporary stay of the injunction pending briefing on Defendants' broader stay request, and ultimately dismissed the appeal at Plaintiff's request because Rud had been transferred to CPS during the ordinary course.

### B.    Plaintiffs' First Amended Complaint.

On September 28, 2023, this Court granted Defendants' motion to dismiss in part and denied in part – dismissing Court I (writ of mandamus claim), Count III (procedural due process based on CPS being necessary for discharge) and Count IV (substantive due process) with prejudice. ECF No. 73 at 9, fn. 2, 15, 32. The Court permitted one of Plaintiffs' claims to go forward: Count II, a claim that Defendants violated procedural due process by failing to effectuate Plaintiffs' CAP transfer orders within a reasonable time and without any process. *Id.* at 11. The Court also permitted Plaintiffs to file an amended complaint alleging individual-capacity claims to save their prayer for damages, which Plaintiffs filed on October 30, 2023. *Id.* at 18-19; ECF No. 77.

The First Amended Complaint ("FAC") contains four counts, each titled the same as the original complaint but includes additional plaintiffs and facts.  ECF No. 77.[2] Defendants pending motion to dismiss outlines Plaintiffs' failure to allege plausible claims that were previously dismissed with prejudice and cannot overcome Defendants' qualified immunity.

## C.    Defendants' Motion To Stay Discovery

On November 21, 2023, Defendants moved for an order to stay discovery until the pending motion to dismiss is resolved.  ECF. Nos. 88, 90.  On December 4, 2023, Plaintiffs served deposition notices for each defendant, and on the following day, served notice of a 30(b)(6) deposition with fourteen broad categories.  Declaration of Emily B. Anderson ("Anderson Decl."), ¶¶ 2-3 & Ex. 1.  On December 13, 2023, Plaintiffs also served their first set of discovery requests encompassing six interrogatory requests (not counting subparts) and six requests for production of documents (not counting subparts).  *Id.*, ¶ 4 & Ex. 2.  The parties met and conferred and agreed that the depositions would not take place until after the pending motion to stay discovery was resolved, and Defendants responses would not be due until two weeks after the Court issues its order.  *Id.* at ¶ 5.

On January 8, 2024, Magistrate Judge Brisbois held a hearing on Defendants' motion to stay discovery.  ECF No. 109.  At that hearing, Judge Brisbois ordered Plaintiffs'

---

[2] Rather than repeat facts, Defendants refer to their memorandum of law in support of their motion to dismiss Plaintiffs' FAC for a recitation of the relevant procedural history and newly alleged facts asserted in Plaintiffs' FAC that underlies the present motion.  ECF No. 96.

outstanding discovery stayed until the issuance of an order on Defendants' motion. *Id.* Defendants' motion to stay discovery remains pending before Judge Brisbois.

>    **D.      Plaintiffs' Present Motion For Preliminary Injunction.**[3]

Plaintiffs are four clients civilly committed to the MSOP in the care and custody of DHS. ECF No. 104 at 5. All four plaintiffs petitioned for a reduction in custody, and the SRB recommended their transfer to CPS. *Id.* at 5-6. The CAP issued the following orders authorizing transfer to CPS: Plaintiff Gardner on May 5, 2023; Plaintiff Alexander on July 11, 2023; Plaintiff Peterson on October 16, 2023; and Plaintiff Mallan on October 25, 2023. *Id.* Plaintiffs allege that they have not been provided any procedural process to challenge Defendants' "refusal to comply with the final CAP order" and the delay in transfer affects their liberty and eventual release into the community. *Id.*

Plaintiffs' motion is supported by a declaration from Plaintiffs' counsel, which does not contain any factual assertions but attaches three CAP orders unrelated to any of the Plaintiffs: (1) CAP Order Setting an Evidentiary Hearing on Civil Contempt from *In re the Civil Commitment of Steven Loren Edwards,* a (2) Civil Contempt Order and related documents from *In the Matter of the Civil Commitment of Al Stone Folson*, and (3) CAP Order denying provisional discharge and discharge from *In the Matter of the Civil Commitment of Kerry Mitchell Lenz.* [4]

---

[3] Plaintiffs filed the present motion nearly three months after filing the FAC, demonstrating the lack of imminent or irreparable harm to any Plaintiff.

[4] All three exhibits demonstrate an effective method for MSOP clients to challenge and seek relief from any alleged failure to transfer to CPS within a reasonable time.

In their motion, Plaintiffs seek an evidentiary hearing to establish one fact: "that the only reason these MSOP patients are not being timely transferred is because MSOP lacks staffed beds in which to place them." ECF No. 104 at 7. When Defendants attempted to meet and confer about the scope of a potential evidentiary hearing, Defendants offered to put that fact into the record by stating in a declaration how long transfer typically takes once a staffed CPS bed becomes available. Anderson Decl. ¶ 6, Ex. 3 at 2-3. Plaintiffs responded to that agreement with a request for additional facts they needed Nancy Johnston's testimony on – none of which were mentioned in Plaintiffs' motion for a preliminary injunction. *Id.* at 2; Anderson Decl. ¶ 7, Ex. 4; *see also* ECF No. 104. When asked how these new topics differed from facts already in the record, Plaintiffs provided no response. Anderson Decl. ¶¶ 6-7, Exs. 3-4.

Instead, Plaintiffs responded to a different email thread asking for testimony of 5 specific facts to forego an evidentiary hearing. Anderson Decl. ¶ 8, Ex. 5. The general topics on which Plaintiffs sought a declaration or evidentiary hearing testimony have significant overlap with Plaintiffs' outstanding (and temporarily stayed) discovery requests and are not mentioned in Plaintiffs' motion for a preliminary injunction. *Compare id. with* Anderson Decl. ¶ 3, Ex. 1, Topics 1, 5, 6, 8, 9, 10, 12, 13, and 14; Ex. 2 at Interrogatory Nos. 3, 4, and 6.[5]

---

[5] The parties intend to continue discussing what material facts, if any, are in dispute that are relevant to the merits of Plaintiffs' preliminary injunction motion and will update the Court accordingly.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To determine whether to issue a preliminary injunction, "the district court must consider: (1) the threat of irreparable harm to the movant; (2) the balance between that harm and the injury that granting the injunction will inflict on the other interested parties; (3) the probability the movant will succeed on the merits; and (4) whether the injunction is in the public interest." *Izabella HMC-MF*, 378 F. Supp. 3d at 777-78 (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). The party seeking injunctive relief bears the burden of proving all the preliminary injunction factors. *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). Likelihood of success is "[t]he most important of the *Dataphase* factors." *Craig v. Simon*, 930 F.3d 615, 617 (8th Cir. 2020) (quoting *Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1981)).

A preliminary injunction is already an extraordinary remedy, but the burden is even higher when a party requests a mandatory preliminary injunction requiring the alteration of the status quo. *See Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir. 1993).

## ARGUMENT

### I. THE COURT SHOULD DECLINE TO APPLY THE LAW OF THE CASE DOCTRINE TO AN INTERLOCUTORY ORDER.

The "law of the case doctrine" is applicable only to final judgments, not interlocutory orders. *Murr Plumbing, Inc. v. Scherer Bros. Financial Services Co.*,

16

48 F.3d 1066, 1070 (8th Cir.1995). A preliminary injunction is not a decision upon the merits of the underlying case; in fact, its purpose is not to determine any controverted right, but to prevent a threatened wrong or any further perpetration of injury, and thus to protect rights until the issues can be determined after a full hearing. *See Benson Hotel Corp. v. Woods*, 168 F.2d 694, 696 (8th Cir. 1948) (quotations omitted). Given its limited purpose, a preliminary injunction is customarily granted on procedures that are less formal and evidence that is less complete than in a trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830 (1981).

Defendants, in their official capacity, previously appealed the preliminary injunction to the Eighth Circuit, which ultimately dismissed the appeal before ruling on the merits of the injunction. Doc. 65 (notice appealing the prior preliminary injunction); *Rud v. Johnston*, No. 23-1577, 2023 WL 6232055, at *1 (8th Cir. May 8, 2023) (granting dismissal of the appeal without reaching the merits of the underlying claims at issue). Therefore, this court is not bound by any appellate court order that warrants application of the law of the case doctrine. And a trial court judge is not firmly bound by its own prior decision in the same way a trial court is bound by the decision of a higher court of review. The doctrine applies to appellate decisions, *see Mosley v. City of Northwoods*, 415 F.3d 908, 911 (8th Cir. 2005), as well as to final decisions by the district court that have not been appealed. Neither scenario is present here. *See, e.g., United States v. Bartsh*, 69 F.3d 864, 866 (8th Cir. 1995) (holding that law of the case is binding on remand); *Houghton v. McDonnell Douglas Corp.*, 627 F.2d 858, 865 (8th Cir.1980) (claiming the rule prevents relitigation of issues which were either "expressly or impliedly disposed of

on appeal"); *Little Earth of the United Tribes, Inc. v. United States Dep't of Housing & Urban Dev.*, 807 F.2d 1433, 1438, 1440–41 (8th Cir.1986) (applying the law of the case doctrine to unappealed orders); *Travelers Ins. Co. v. Westridge Mall Co.*, 826 F. Supp. 289, 293, n.2 (D. Minn. 1992), *aff'd*, 994 F.2d 460 (8th Cir. 1993); *Ass'n of Residential Res. in Minnesota (ARRM) v. Minnesota Comm'r of Hum. Servs.*, No. CUV,03-2438 JRT/FLN, 2004 WL 2066822, at *7 (D. Minn. Aug. 18, 2004) (reminding the parties that its decision to deny the preliminary injunction "does not constitute the law of the case of further proceedings and does not limit or preclude the parties from litigating the merits").

Because this Court has inherent power to reconsider and modify an interlocutory order any time prior to entry of judgment, the law of the case doctrine does not apply to the present request for a preliminary injunction. *See Conrod v. Davis*, 120 F.3d 92, 95 (8th Cir.1997) (noting the rule does not "deprive the district court of the ability to reconsider earlier rulings" to avoid reversal).[6]

---

[6] This also is not an appropriate case for collateral estoppel, or issue preclusion. The granting or denial of a preliminary injunction is not a final judgment for the purposes of collateral estoppel. *See Medtronic, Inc. v. Gibbons*, 684 F.2d 565, 569 (8th Cir. 1982); *B&B Hardware, Inc. v. Hargis Indus., Inc.,* 575 U.S. 138, 148 (2015) (requiring a "valid and final judgment" for issue preclusion to apply). Claiming that issue preclusion "may apply" because the injunction is appealable and "could be final" does not warrant application of issue preclusion, particularly since the prior proceeding must have resulted in a final judgment on the merits to be accorded preclusive effect. Doc. 104 at n.3; *see also, e.g., Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384, 112 S. Ct. 748, 760, 116 L.Ed.2d 867 (1992) (affirming issue preclusion does not foreclose reconsideration of prospective relief). In any case, none of the new Plaintiffs were parties at the time of the Court's prior order or to that order, nor are they in privity with Mr. Rud (especially since the Court denied certification of any class). *See Glinters v. Frazier*, 614 F.3d 822, 826 (8th Cir. 2010) (reciting the elements of collateral estoppel, including the requirement that the parties by the same or in privity).

## II.   PLAINTIFFS FAIL TO ESTABLISH THE *DATAPHASE* FACTORS.

Plaintiffs offer no evidence that their claims are likely to succeed and no evidence demonstrating that they are at risk of suffering irreparable harm.  Even if the Court relied entirely on the declaration submitted by Plaintiffs' counsel referencing other MSOP clients, that "evidence" does not meet their high burden for the extraordinary remedy they seek under any of the *Dataphase* factors.

### A.   Plaintiffs Are Unlikely To Succeed On The Merits. [7]

Plaintiffs are not likely to succeed on the merits of their lawsuit and, on this basis alone, the Court should deny their motion.  *See Newton Cty. Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 113 (8th Cir. 1997) ("If a plaintiff's legal theory has no likelihood of success on the merits, preliminary injunctive relief must be denied."); *Craig v. Simon*, 930 F.3d at 617 (likelihood of success is the "most important" *Dataphase* factor).

### 1.   Plaintiffs Are Unlikely To Succeed On Counts III And IV.

The Court has already dismissed Counts III (procedural due process) and IV (substantive due process) of Plaintiffs' original complaint for failing to state a legal claim. Doc. 73 at 9, fn. 2 (dismissing Count III); *id.* at 17-18 (dismissing Count IV).  Plaintiffs have clarified that they repleaded Counts III and IV only for the purposes of an appeal and to "avoid any suggestion that Plaintiffs voluntarily dismissed those claims" – not to

---

[7] In this response, Defendants do not recite every reason why Plaintiffs' claims are likely to fail, and instead focus on the due process claims – which appear to underlie Plaintiffs' motion for an injunction.  ECF No. 104 at 10 (claiming Plaintiffs "have an underlying liberty or property interest in timely transfer to CPS which has been denied them without due process.").  Defendants respectfully request that the Court refer to Defendants' pending motion to dismiss for a more thorough explanation of all the reason the claims fail as a matter of law.  *See generally* ECF No. 96.

advance them under new theories.  Doc. 101 at 3, fn. 3.  For the reasons the Court has previously held, and Defendants have previously argued (*see* Doc. 96 at 12-17), Plaintiffs are unlikely to succeed on Counts III and IV and no injunction should be granted on those bases.

### 2. Plaintiffs Are Unlikely To Succeed On Their Mandamus Petitions (Count I)

Plaintiffs also do not point to any case law that a state law mandamus petition would support preliminary injunctive relief under Fed. R. Civ. P. 65.  *See* ECF No. 104 (failing to discuss the merits of their mandamus petition).  The result of a mandamus proceeding is, functionally, an injunction compelling a government official to act.  Minn. Stat. § 586.01.  Minnesota's mandamus statute already provides an avenue for immediate relief if a petition shows a right to it: a peremptory writ.  Minn. Stat. § 586.04.  But Plaintiffs have not shown that they are entitled to a peremptory writ of mandamus.  *See* ECF No. 96 at 18-21.  And, this Court has no jurisdiction to issue a writ under Minnesota statute.  Minn. Stat. § 586.11 (vesting exclusive jurisdiction to issue writs to Minnesota courts); *Chairse, et al. v. State of Minn. Dep't of Human Servs., et al.*, Order at 21-22, No. 23-CV-355 (ECT/ECW), Doc. 47 (Sept. 14, 2023).

Plaintiffs' mandamus petition does not meet the statutory requirements to issue a peremptory writ.  Doc. 96 at 20-21.  Plaintiffs have an adequate alternative legal remedy (a contempt proceeding, as attached as evidence in support of their motion, for one; and this motion, if granted, which would provide them the same relief as a writ, for another). *See Madison Equities, Inc. v. Crockarell*, 889 N.W.2d 568, 574 (Minn. 2017) (a plaintiff

seeking a writ of mandamus must show that there is no "plain, speedy, and adequate remedy in the ordinary course of law"). The contours of the "legal duty" Plaintiffs allege Defendants have to transfer them is also not yet clear, and certainly not on the face of their petition. *See Day v. Wright Cnty.*, 391 N.W.2d 32, 34 (Minn. Ct. App. 1986). Finally, Plaintiffs have failed to plead funding available in their petition, which precludes the issuance of a peremptory writ. Minn. Stat. § 586.04 (peremptory writs may only issue when "it is apparent that no valid excuse for nonperformance can be given"); *State ex rel. Traeger v. Carleton*, 64 N.W.2d 776, 779 (Minn. 1954). What is more, the record is replete with evidence that Defendants *do* have valid reasons that Plaintiffs have not yet been transferred to CPS. Doc. 29 at ¶¶ 7-28; Doc. 31 at ¶¶ 12-13, 15-17. For these reasons, in addition to those Defendants have previously argued (Doc. 23 at 10-16), Plaintiffs are unlikely to succeed on a mandamus petition and are not entitled to a peremptory writ.

### 3. Plaintiffs Have Not Alleged A Procedural Deprivation To Succeed On A Procedural Due Process Claim (Count II). [8]

Plaintiffs also do not state a legally sufficient procedural due process claim for three reasons: (1) Plaintiffs do not seek additional procedure in their procedural due process claim; (2) Plaintiffs have adequate procedure to adjudicate and enforce their Transfer Orders; and (3) Plaintiffs' Transfer Orders do not create a constitutionally-protected interest.

---

[8] Defendants acknowledge that the Court has previously held that Count II states a legally sufficient procedural due process claim and that at least Plaintiff Rud is likely to succeed on that claim for the purposes of Rud's preliminary injunction. Doc. 73; Doc. 35. Defendants reassert their arguments to the contrary to preserve those arguments on appeal.

a.   **Plaintiffs Do Not Seek Procedure Nor Identify What Procedure They Are Entitled To.**

Procedural due process does not apply where a plaintiff claims that no amount of process would suffice to justify the alleged deprivation. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) ("In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional.'").  Instead, a procedural due process plaintiff alleging a deprivation of a protected interest "must then establish that the state deprived him of that interest without sufficient 'process.'"  *Krentz v. Robertson*, 228 F.3d 897, 902 (8th Cir. 2000).  The question therefore, is not whether Plaintiffs are entitled to the outcome they seek – immediate transfer to CPS – but whether Plaintiffs are entitled to a different *procedure* to challenge the timeliness of transferring them.  *Krentz*, 228 F.3d at 902-05; *see also Parkridge Invs. Ltd. P'ship by Mortimer v. Farmer's Home Admin.*, 13 F.3d 1192, 1197 (8th Cir. 1994) (observing that the due process claim was not a procedural due process case because the plaintiff was not claiming that defendant denied it a hearing or some other procedural safeguard, but was complaining about the likely outcome).

Procedural due process is only meant to protect a person from the denial of *procedures* allowing him to contest the basis on which he has been deprived of a protected interest.  *Carey v. Piphus*, 435 U.S. 247, 259-60 (1978).  "A plaintiff who seeks only to stop a challenged practice entirely, rather than to be afforded procedural protections in connection with that practice, does not have a procedural due-process claim."  *Hough v. Shakopee Pub. Sch.*, 608 F. Supp. 2d 1087, 1112 (D. Minn. 2009); *see also Parrish v.*

*Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998) ("A procedural due process claim focuses not on the merits of a deprivation, but on whether the State circumscribed the deprivation with constitutionally adequate procedures.").

But here, Plaintiffs do not seek procedure, nor do they identify what procedure they believe could have justified their wait to be transferred to CPS. *See generally* FAC; ECF No. 104. Instead, Plaintiffs argue that "transfer … after judicial order is not discretionary, and Defendants are required by statute to effectuate transfer. FAC, ¶ 61; *id.*, ¶ 55 (alleging Defendants are statutorily required to "immediately" comply with the Transfer Order). These allegations confirm Plaintiffs' theory that *no procedure* would suffice to excuse Plaintiff's wait. Instead, Plaintiffs' allegations jump to their desired result of the "adequate procedure": immediate transfer, regardless of the process available to them. In other words, Plaintiff does not ask for more notice or a hearing on the status of his transfer to CPS – they ask *to be transferred*. This is exactly what *Hough* and *Parrish* find is *not* a procedural due process claim – a claim on the merits of Plaintiffs' deprivation of transfer to CPS.

Nor do Plaintiffs contemplate what, if any, procedure may serve to make Defendants' alleged failure to transfer constitutionally permissible. ECF No. 104 (claiming Plaintiffs have "absolutely no process by which to challenge the Defendants decision making or conduct"). Instead, Plaintiffs rely entirely on the prior injunction order that based its decision on the deprivation of an ultimate right and not the process invoked to get there. *See, e.g., Zinerman*, 494 U.S. at 125 (noting that a deprivation itself is not inherently

unconstitutional in a procedural due process claim). Because Plaintiffs have not identified

any procedural safeguards they are entitled to, this claim fails.

>   **b.** **Plaintiffs Have Not Availed Themselves Of The Procedure That Exists.**

Minnesota provides Plaintiffs an adequate procedure to challenge their purportedly

unlawful wait to transfer to CPS. In fact, Plaintiffs provide the Court with evidence of

existing civil contempt procedure that provided the same result they seek now when an

individual claimed MSOP unlawfully failed to transfer them to CPS: an order mandating

transfer. *See* ECF No. 105-1 (illustrating three cases where civil contempt was sought

before the CAP and DHS was ordered to transfer MSOP clients within a specified period).

State court contempt proceedings exist for the sole purpose of adjudicating state

court order violations and enforcing violated orders. *Hopp v. Hopp*, 156 N.W. 2d 212

(Minn. 1968). "The contempt power lies at the core of the administration of a State's

judicial system." *Juidice v. Vail*, 430 U.S. 327, 335 (1977).[9] Here, MSOP clients with

transfer orders may use civil contempt proceedings to seek the very relief Plaintiffs seek,

and which they complain they have no constitutionally adequate process to obtain.

ECF. No. 105-1 (holding the Commissioner in contempt for failing to transfer MSOP

clients pursuant to their order for transfer, and each client was then transferred).

---

[9] Though *Juidice* prohibited direct interference with a contempt proceeding – a federal court enjoining it – the principle that contempt proceedings are core functions of the State judiciary that federal courts should respect out of principles of comity and federalism than that narrow set of circumstances. Accordingly, a federal court's interference with or superseding of contempt proceedings should be done circumspectly, as such interference "can readily be interpreted 'as reflecting negatively upon the state courts' ability to enforce constitutional principles.'" *Id.* at 336 (citation omitted).

Although this Court previously held that state civil contempt proceedings are not constitutionally adequate process to adjudicate or enforce a state court order, this is contrary to well-established principles of federalism and comity.  *See, e.g., Juidice*, 430 U.S. at 338-39 (determining a district court erred in interfering with a state court's contempt proceedings for the reasons of federalism and comity); *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982) ("Minimal respect for the state processes ... precludes any presumption that the state courts will not safeguard federal constitutional rights.").  Minnesota state courts have enforced their own orders via contempt for decades without any suggestion that such procedure is constitutionally inadequate.

To date, there has been no adjudication of whether Defendants have violated Plaintiffs' transfer orders.  Plaintiffs failure to use the available process to determine those issues for themselves does not mean that the State has failed to provide them a constitutionally adequate process to effectuate transfer within a reasonable time after a CAP order.

### c.  Transfer Orders Do Not Inherently Create A Constitutionally-Protected Liberty Interest.

A "reasonable time" obligation under a state court order does not inherently give rise to a constitutionally protected liberty interest.  *See Senty-Haugen v. Goodno*, 426 F.3d 876, 886 (8th Cir. 2006) ("Protected liberty interest 'may arise from two sources – the Due Process Clause itself and the laws of the States.").  State laws and state court orders "create a protectable liberty interest only when they: (1) place substantive limitation

on the exercise of official discretion; and (2) contain explicit mandatory language comprising specific directives to the decision maker that if the regulations' substantive predicate acts are present, a particular outcome must follow." *William v. Nix,* 1 F.3d 712, 717 (8th Cir. 1993).

*McDeid* did not hold that the statutory obligation at issue gave rise to a federal constitutional right. *McDeid*, 984 N.W.2d at 879 ("We remand to the court of appeals to address whether the State Officials' clear obligation to transfer the Patients to CPS within a reasonable time following a CAP transfer order gives rise to a federal due process right."). Nor do Plaintiffs provide any analysis as to why the Constitution dictates that Defendants have violated the transfer order or that the Constitution protects the alleged "enforcement" of the transfer order. *See generally* ECF No. 104. Plaintiffs simply repeat their unsupported claim that the Minnesota statutes give rise to a protected liberty interest, but *McDeid* did not hold that. *Id.* Because there is no guidance, either in Plaintiffs' transfer orders or from case law, as to when a "reasonable time" has passed, and no evidence in the record that Defendants' delay is unreasonable as to each Plaintiff, their claims are unlikely to succeed.

### B.    Defendants And The Public Would Suffer Great Harm If The Injunction Is Granted.

When considering the balance of harm on a motion for a preliminary injunction, "[t]he goal is to assess the harm the movant would suffer absent an injunction, as well as the harm other interested parties and the public would experience if the injunction issued." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015) (citing *Pottgen v. Mo.*

*State High Sch. Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994)).   Defendants have previously provided evidence of the significant harm to MSOP operations if staff resources and space are overburdened by transfers in excess of CPS's current staffed capacity.

First, Defendants suffer significant harm to the integrity of MSOP by exceeding the designed program staffing.  Granting Plaintiffs' injunctions irreparably harms Defendants' statutorily-mandated discretion to run MSOP according to its statutory directive: to provide treatment to the clients committed there and manage operations while ensure the public's safety.  Minn. R. 9515.3040, subp. 2; *see also Senty-Haugen v. Goodno*, 462 F.3d 876, 887 (8th Cir. 2006) ("federal courts are to give deference to state officials managing a secure facility, and [MSOP] staff have a substantial interest in providing efficient procedures to address security issues").   It is undisputed that Defendants are currently managing significant resource scarcity issues and that Defendants believe the program suffers significant harm to its program design, efficacy, and credibility when staffing ratios are exceeded.  Johnston I, Decl. ¶¶ 7-19, 24-28; Hébert Decl. ¶¶ 12-13, 15-17.

The severity of harm that comes from interfering in those operations has long been cautioned by courts.  *See Bell v. Wolfish*, 441 U.S. 520, 562 (1979) (warning of the "natural tendency to believe that [one's own] individual solutions to often intractable problems are better and more workable than those persons who are actually charged with and trained in running of a particular institution under examination.").   This is especially true when dealing with "the complex and intractable problems" inherent in administering a custodial facility like MSOP.   *See Senty-Haugen v. Goodno*, 462 F.3d 876, 887 (8th Cir. 2006); *see also, e.g., Rogers v. Scurr*, 667 F.2d 1211, 1214 (8th Cir. 1982) (noting "judicial

restraint is especially called for in dealing with the complex and intractable problems of prison administration" and that federal courts should abstain from issuing injunctions on prison officials "in the absence of a concrete showing of a valid claim and constitutionally mandated directives for relief").

Plaintiffs repeatedly present no evidence to refute Ms. Johnson's or Ms. Hébert's expertise in managing MSOP's operations.

Second, there may be significant consequences on staff morale that led to staff retention problems if Plaintiffs injunctions are granted. Johnston I, Decl. ¶¶ 26, 28; Hébert Decl. ¶ 13. If more staff quit, existing staff have to take on an even higher case load, which exacerbates potential treatment harm to MSOP's program design and to existing clients. Johnston I, Decl. ¶ 26. Fewer staff could lead to further reduced capacity at CPS, further decreased treatment opportunities, and greater security concerns. Johnston I, Decl. ¶ 25, Hébert Decl. ¶¶ 16-17.

Third, there may be significant regulatory consequences on MSOP. Those could include escalating fines, which would put further strain on MSOP's already-limited budget, and closure of spaces that do not comply with regulatory requirements. Johnston I, Decl. ¶ 28.

Finally, granting an injunction for these four plaintiffs causes additional delay to MSOP clients who may be ahead of these plaintiffs on the CPS waitlist. Expediting these Plaintiffs' transfer to CPS inherently delays the transfer of anyone who has been waiting longer to move to CPS and had been scheduled to transfer before plaintiffs, but do not have an injunction order. Johnston I, Decl. ¶ 6 (clients with transfer orders are typically

transferred in the order in which they received their transfer order). This could act as a further blow to the credibility of the program and the fairness of the system in the eyes of those other clients awaiting transfer, which does the public no good.

Given the evidence of broad harm that would result from the proposed injunction and Plaintiffs' failure to submit any actual evidence of harm[10], this factor weighs against granting Plaintiffs' requested injunction.

### C.    Plaintiffs Have No Evidence Of Irreparable Harm.

Plaintiffs have not established that they suffer irreparable harm absent an injunction. Evidence of irreparable harm is required for an injunction to issue, and such harm must be "certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (internal quotation marks omitted). Here, Plaintiffs have not submitted any evidence of the harm they are allegedly enduring while waiting to be transferred to CPS. Instead, they claim the evidentiary hearing will establish "that the only reason these MSOP patients are not being timely transferred is because MSOP lacks staffed beds in which to place them," ignoring entirely what harm or injury these Plaintiffs allegedly suffer while waiting to be transferred to CPS. ECF No. 104 at 6-7. Their only argument for irreparable harm appears to be that the alleged violation is inherently harmful, but case law is clear that violations of constitutional rights do not necessarily or inherently constitute irreparable harm. *See*

---

[10] And Plaintiffs' allegations that they are being harmed by not receiving certain treatment allegedly "only available at CPS" is flatly contradicted by the evidence. Hébert Decl. ¶¶ 6-10.

*Let Them Play MN v. Walz*, 517 F. Supp. 3d 870, 887 (D. Minn. 2021) (collecting cases holding that a constitutional violation is not coextensive with irreparable harm).

On the other hand, the evidence at this stage of litigation establishes that Plaintiffs, like all MSOP clients, are receiving treatment commensurate with their treatment team's analysis of their clinical presentation. Hébert Decl. ¶¶ 7-8. Although Plaintiffs claim that this delay in transfer "affects [their] liberty and [] delay [their] eventual release into the community," they provide no evidence establishing how their treatment is affected by not being transferred to CPS – especially since CPS is not a phase of treatment, it is a location.[11]

And contrary to Plaintiffs' assertions, transfer to CPS is not required prior to provisional or full discharge. Any alleged delay in Plaintiffs' transfer is not harming their opportunity to petition for additional reductions in custody. *See* Minn. Stat. §§ 253D.30-.31 (setting forth statutory factors for provisional and full discharge, which do not include whether the client is currently housed at CPS). Nor is "completing all three treatment Phases" required by statute for provisional or full discharge. *Id.* In short, Plaintiffs cannot show that their alleged delay in transfer has irreparably harmed their treatment progression or opportunity to further reduce their level of custody.

What is more, Plaintiffs affirmatively allege that they have been suffering the same harm from delayed transfer for several months – including over two months since these Plaintiffs

---

[11] The undisputed evidence demonstrates that community outings at CPS are wholly clinical decisions, made based on each client's clinical presentation and without consideration of their location at CPS or within the secure perimeter. Hébert Dec. ¶ 9. In fact, few Phase II clients who reside at CPS participate in community outings, and each Plaintiff would continue to work on the same treatment targets whether they are at CPS or not. *Id.* ¶¶ 14, 8.

joined this case before they even brought their motion. FAC, ¶¶ 5-8. Throughout this time, Plaintiffs do not allege they have sought contempt for failure to transfer them or undertaken any other legal action to attempt to put a stop to their alleged ongoing irreparable harm. *See generally* FAC. This unexplained delay in bringing their motion weighs against a finding of imminent irreparable harm. *Adventist Health Sys./SunBelt, Inc. v. United States Dep't of Health and Hum. Servs.*, 17 F.4th 793, 805 (8th Cir. 2021) (a year-long delay in bringing suit refuted allegations of irreparable harm); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (nine-month delay refutes allegations of irreparable harm).

## III.    PLAINTIFFS' REQUEST FOR AN EVIDENTIARY HEARING SHOULD BE DENIED.

Rule 65 does not explicitly require an evidentiary hearing on a preliminary injunction motion, especially when a hearing adds little, if anything, to what the parties have already presented to the court. Notably, courts often rely entirely on written evidence when no conflict about the facts requires live testimony. *See United Healthcare Ins. Co. v. AdvancePCS,* 316 F.3d 737, 744 (8th Cir. 2002) ("An evidentiary hearing is required prior to issuing a preliminary injunction only when a material factual controversy exists."); *Movie Sys., Inc. v. MAD Minneapolis Audio Distribs.*, 717 F.2d 427, 432 (8th Cir.1983) ("it has often been held that affidavits may be received at a hearing on a motion for a preliminary injunction" and finding "no impropriety in the district court's reliance" on affidavits in considering whether to modify a preliminary injunction without an evidentiary hearing (citing *Wounded Knee Legal Def./Offense Comm. v. Fed. Bureau of Investigation*, 507 F.2d 1281, 1287 (8th Cir.1974)).

A. **There Are No Disputed Facts Material To Plaintiffs' Preliminary Injunction Motion.**

Here, Plaintiffs do not contest the written evidence, nor do they submit evidence to contradict Ms. Johnston or Ms. Hebert's declarations. Instead, Plaintiffs seek an evidentiary hearing to establish that "the only reason these MSOP patients are not being timely transferred is because MSOP lacks staffed beds in which to place them." ECF No. 104 at 7. But this fact has been undisputed since at least March 2023. *See* Johnston I Decl., ¶ 6 ("when there are more clients with orders granting their transfer than there are available CPS beds, MSOP assigns the next open CPS bed to the client who has an order granting their transfer with the earliest effective transfer order day…"), ¶ 7 ("Additional beds have been necessary at CPS in order to keep up with a significant increase in CAP orders granting clients transfer to CPS."); ¶ 19 ("So even though there are 145 *beds*, CPS currently only has sufficient clinical and other staff to support and house 130 *clients*."); *see also* Johnson II Decl., ¶ 4 (confirming "CPS only has sufficient clinical and other staff to support and house 130 clients"). If this is Plaintiffs' sole purpose in requesting an evidentiary hearing, the court can rule on the present motion based entirely on the submitted declarations because there is no dispute as to the basic facts at issue. *See Kansas City S. Transp. Co. v. Teamsters Loc. Union #41*, 126 F.3d 1059, 1068 (8th Cir. 1997) (holding an evidentiary hearing on the undisputed facts was unnecessary).

Even if Plaintiffs attempt to claim some facts are in dispute, the merits underlying their injunctive request involves the application of substantive law to those facts. The Court has adequate documentary evidence on which to base an informed, albeit

preliminary, conclusion as to whether Plaintiffs have stated an adequate procedural due process claim under the Fourteenth Amendment (and indeed the Court has already done so in what Plaintiffs agree is a substantively identical motion). *See Bradley v. Pittsburgh Bd. of Educ.,* 910 F.2d 1172, 1176 (3d Cir. 1990) (affirming a hearing would not be necessary if the movant is proceeding on a legal theory which cannot be sustained, because then there would be no showing of a likelihood of success on the merits). Because the facts material to Plaintiffs' motion remain undisputed, the request for an evidentiary hearing should be denied.

**B.    An Evidentiary Hearing Would Frustrate The Court's Administration Of Discovery.**

Moreover, Plaintiffs all but admit that they are seeking an evidentiary hearing to find a way around Magistrate Judge Brisbois' temporary stay of their discovery requests (including a deposition of Nancy Johnston) and upcoming order on Defendants' motion to stay discovery. ECF No. 104 at 6-7 (claiming Defendants' "refusal" to participate in discovery pending a ruling on their motion to stay discovery is what prompted an evidentiary hearing "to produce a more robust record to support their injunction motion."); *see also* Anderson Decl. ¶ 5 (noting that, prior to Judge Brisbois temporarily staying all discovery requests pending his ruling on the motion to stay, the parties had agreed no answers to discovery were due).

The improper purpose of Plaintiffs' request is even more evident through Plaintiffs' efforts to expand the facts in "dispute." When Defendants attempted to meet and confer about the scope of a potential evidentiary hearing, Plaintiffs first indicated all they needed

was clarification on how long it would take MSOP to transfer a waitlist client when a staffed CPS bed became available. Anderson Decl., ¶ 6, Ex. 3 at 4. Defendants offered to put that fact into the record because they (of course) would not dispute MSOP staff's testimony on that timing. *Id.*, Ex. 3 at 2-3. Plaintiffs responded to that agreement with a request for additional facts they needed Nancy Johnston's testimony on – none of which were mentioned in Plaintiffs' motion for a preliminary injunction. *Id.*, Ex. 3 at 2; *see also* ECF No. 104. When pressed on how these new topics differed from facts already in the record, and how facts on those presented by a Defendant could be "disputed" by Defendants or material to the motion, Plaintiffs provided no response. Anderson Decl., ¶¶ 6-7, at Exs. 3-4.

Instead, days later, Plaintiffs responded to a different email asking for testimony of 5 specific facts to forego an evidentiary hearing (without even asking if those facts were accurate). Anderson Decl. ¶ 8, Ex. 5. The general topics on which Plaintiffs sought a declaration or evidentiary hearing testimony have significant overlap with Plaintiffs' outstanding (and temporarily stayed) discovery requests, and nothing to do with the limited hearing request Plaintiffs made in their briefing on this motion. *Compare id. with* Anderson Decl. at Ex. 1, Topics 1, 5, 6, 8, 9, 10, 12, 13, and 14; Ex. 2 at Interrogatory Nos. 3, 4, and 6. In short, it appears Plaintiffs are seeking discovery by other means in their expanding request for an evidentiary hearing.

Any assertion that material factual disputes exist is belied by Plaintiffs' own argument, repeated frequently, that their motion is "in all material respects identical" to Rud's prior motion. ECF No. 104 at 1; *see also id.* at 2-3,  9. Indeed, Plaintiffs state,

"No material circumstances have changed for the purposes of this motion." *Id.* at 9.  By that reasoning, an evidentiary hearing is unnecessary because (as Plaintiffs asserted previously) all material facts the Court needs to decide the motion are already in the record.

Allowing Plaintiffs to end-around the Court's administration of discovery is not a proper purpose for an evidentiary hearing.  As Plaintiffs themselves argue, the parties do not dispute the material facts relevant to their motion, and accordingly the Court need not order an evidentiary hearing.

### C.   IF THE COURT GRANTS PLAINTIFFS' INJUNCTION, DEFENDANTS REQUEST THE COURT STAY THE INJUNCTION PENDING APPEAL.

If the Court is unpersuaded by Defendants' arguments and grants Plaintiffs' injunction, Defendants request that, with that order, the Court either (1) stay the injunction pending Defendants' appeal or (2) indicate the Court does not intend to stay its order so that Defendants may immediately seek relief from the 8th Circuit.

As the Court is aware, after it granted Plaintiff Rud's previous motion for a preliminary injunction, Defendants appealed under 28 U.S.C. § 1292(a)(1).  *See* Doc. 38. Defendants also moved to stay the injunction pending the 8th Circuit's consideration of that appeal.  Doc. 39.  Defendants expect that, if the Court grants Plaintiffs' motion, they would follow that same path.

In analyzing whether to stay an injunction pending appeal, courts consider essentially the same factors as they consider in issuing the injunction but with the burden reversed:

"(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

*Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also id.*, 556 U.S. at 434 (noting that the applicant for a stay bears the burden). For all the reasons Defendants set forth above, the Court should stay any injunction pending Defendants' appeal.

Defendants are of course aware that the Court previously denied their motion for a stay of the earlier injunction and considered it, essentially, a motion to reconsider. Doc. 53 at 5. But parties generally must seek a stay in the district court before seeking that same relief in the Court of Appeals. Fed. R. App. P. 8(a). Accordingly, if the Court issues an order granting Plaintiffs' preliminary injunction motion, Defendants request that it simultaneously state whether it will stay that order. Doing so would increase judicial efficiency and allow the parties and the Court to streamline a potential appeal.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction and request for an evidentiary hearing should be denied.

Dated: January 24, 2024.

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

***s/ Jacqueline Clayton***
AARON WINTER
Assistant Attorney General
Atty. Reg. No. 0390914

EMILY B. ANDERSON
Assistant Attorney General
Atty. Reg. No. 0399272

JACQUELINE CLAYTON
Assistant Attorney General
Atty. Reg. No. 0504082

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1024 (Voice)
(651) 282-5832 (Fax)
aaron.winter@ag.state.mn.us
emily.anderson@ag.state.mn.us
jacqueline.clayton@ag.state.mn.us

*Attorneys For Defendants*

|#5677044-v1