UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| JAMES JOHN RUD, BRIAN KEITH HAUSFELD, JOSHUA ADAM GARDNER, ANDREW GARY MALLAN, DWANE DAVID PETERSON, and LYNELL DUPREE ALEXANDER, *on behalf of themselves and all others similarly situated*; THOMAS WEBBER, KENNETH DONALD HAND, and RICKY DURBIN, | Civil No. 23-486 (JRT/LIB) |
| | **MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| v. | |
| NANCY JOHNSTON, *Executive Director, Minnesota Sex Offender Program*, and SHIREEN GANDHI, *Department of Human Services Commissioner, in their individual and official capacities*, | |
| Defendants. | |

Daniel E. Gustafson and Gabrielle Kolb, **GUSTAFSON GLUEK PLLC**, 120 South Sixth Street, Suite 2600, Minneapolis, MN 55402, for All Plaintiffs.

Abou Amara, Jr. and Joseph Nelson, **GUSTAFSON GLUEK PLLC**, 120 South Sixth Street, Suite 2600, Minneapolis, MN 55402, for Plaintiffs James John Rud, Brian Keith Hausfeld, Joshua Adam Gardner, Andrew Gary Mallan, Dwane David Peterson, and Lynell Dupree Alexander.

Anthony Stauber and David A. Goodwin, **GUSTAFSON GLUEK PLLC**, 120 South Sixth Street, Suite 2600, Minneapolis, MN 55402; Hannah L. Scheidecker, **FREMSTAD LAW**, 3003 Thirty-Second Avenue South, Suite 240, P.O. 3143, Fargo, ND 58103, for Plaintiffs James John Rud and Brian Keith Hausfeld.

Aaron Winter, Benjamin C. Johnson, and Joao C.J.G. De Medeiros, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suites 600, 1100, 1400, Saint Paul, MN 55101, for Defendants.

Plaintiffs John James Rud, Brian Keith Hausfeld, Joshua Adam Gardner, Dwane David Peterson, Lynell Dupree Alexander, Andrew Gary Mallan, Kenneth Hand, Ricky Durbin, and Thomas Webber (collectively "Plaintiffs") bring this action against Nancy Johnston and Shireen Gandhi (collectively "Defendants") under 42 U.S.C. § 1983. Plaintiffs, who are civilly committed to the Minnesota Sex Offender Program ("MSOP"), challenge the Defendants' delay in transferring them to a less-restrictive facility, Community Preparation Services ("CPS"), following a valid and effective transfer order. Plaintiffs argue that they have a protected liberty and property interest in being transferred to CPS within a reasonable amount of time, and that Defendants deprived them of that interest by failing to transfer them within a reasonable amount of time without process.

Plaintiffs and Defendants now move for summary judgment. The Court will deny the Plaintiffs' motion because there remains a genuine issue of fact over what constitutes a reasonable amount of time to transfer an MSOP patient to CPS. The Court will deny the Defendants' motion because this case is not moot, and Defendants' lack of any procedure for patients to challenge their placement on the waitlist to be transferred to CPS does not comply with procedural due process.

## BACKGROUND

### I. FACTS

Plaintiffs have been civilly committed to the MSOP to receive sex offender treatment. *See* Minn. Stat. § 246B.02. Defendant Shireen Gandhi, the temporary Commissioner of the Department of Human Services ("DHS"), is entrusted with establishing and maintaining the MSOP. *Id.*[1] Defendant Nancy Johnston, MSOP's Executive Director, oversees the program. *Id.* § 246B.01, subd. 2c; (Decl. of Nancy Johnston ("Johnston Decl.") ¶¶ 2–3, Apr. 1, 2025, Docket No. 151.)

#### A.   Structure of the MSOP

MSOP patients are civilly committed for an "indeterminate period of time." Minn. Stat. § 253D.07, subds. 3, 4. The goal of the MSOP is to safely reintegrate patients back into the community by providing them with treatment "best adapted . . . to rendering further supervision unnecessary." *Id.* § 253B.03, subd. 7. There are three MSOP facilities: two secure treatment facilities in Moose Lake and St. Peter, and one unlocked, less-restrictive facility in St. Peter, referred to herein as CPS, short for Community Preparation Services. *Id.* §§ 253D.02, subd. 13; 246B.01, subd. 2a; (*see also* Johnston Decl. ¶ 4; Decl. of Jannine Hébert ("Hébert Decl.") ¶¶ 5–7, Mar. 13, 2023, Docket No. 31.)

---

[1] *See Shireen Gandhi*, Minn. Dep't of Hum. Servs. (Feb. 3, 2025) https://mn.gov/dhs/media/executive-staff-bios/media-bio-gandhi.jsp [https://perma.cc/9XNS-PSEG].

The MSOP has three phases.  (Hébert Decl. ¶ 4.)  Phase I is a psychological assessment to determine a patient's treatment needs; Phase II explores the underlying causes of a patient's offending behavior and strategizes methods to combat it; Phase III focuses on ensuring successful community reintegration.  (*Id.* ¶¶ 5–7.)  Patients are housed at one of the three facilities depending on their progress and treatment needs.  (*Id.*)  Patients in Phase III typically reside either in the secure facility at St. Peter or at the less-restrictive CPS facility.  (*Id.* ¶ 7.)

Patients at CPS can participate in community outings; though, such outings are not automatically available, and clients in the secure facility at St. Peter can also participate in the outings.  (Johnston Decl. ¶ 4; Hébert Decl. ¶ 9.)  Whether or not a patient is eligible to participate in community outings depends on the clinical decisions of the patient's treatment team.  (Johnston Decl. ¶ 4; Hébert Decl. ¶ 9.)

Patients may petition for provisional or full discharge from commitment.  *See* Minn. Stat. §§ 253D.27, 253D.30–.31.  There is no requirement that MSOP patients reside at CPS to be eligible for provisional or full discharge, as patients who never resided at CPS have been provisionally discharged.  *E.g.*, *In re Braylock*, Appeal Panel No. AP15-9038, Order (Aug. 21, 2025) (ordering the discharge of a patient residing on the St. Peter campus); *In re: Breland*, Appeal Panel No. AP15-9054, Order (Sept. 16, 2016) (same); (Decl. of Jacqueline Clayton ("Clayton Decl.") ¶ 3, Ex. B ("Expert Report") at 8, Apr. 1, 2025,

-4-

Docket No. 150.)[2] Since September 2021, seven patients have been granted provisional discharge while living inside the secure perimeter of St. Peter. (Expert Report at 8.) However, Plaintiffs allege that transfer to CPS is functionally required in order to be granted discharge per MSOP policy and practice. (2nd Am. Compl. ¶ 22, Sept. 23, 2024, Docket No. 136.)

### B. Transfer to CPS

Transfer to CPS is statutorily designated as a "reduction in custody" and is only possible following an order from the Commitment Appeal Panel ("CAP"). Minn. Stat. §§ 246B.01, subd. 2a; 253D.27, subd. 1(b); 253D.29. CAP orders may be appealed to the Court of Appeals, but if an appeal is not filed, CAP orders become effective after fifteen days. *Id.* § 253D.28, subds. 3, 4.

It typically only takes two days to transfer a patient from the secure perimeter of the St. Peter facility to CPS once an opening at CPS becomes available. (Johnston Decl. ¶ 36.) CPS has 145 beds, but it currently only has enough staff to support and house 130 patients. (*Id.* ¶ 26.) Thus, not all of the patients with active transfer orders have been transferred to CPS.[3] (*Id.* ¶ 37.) When there are not enough empty, staffed beds available to transfer MSOP patients to CPS, patients with active transfer orders are placed on a waitlist to be moved to CPS when a bed becomes available. (*Id.* ¶¶ 36–37.) Patients are

---

[2] The Court cites to the original pagination of the expert report.
[3] As of April 1, 2025, there were 15 patients on the waitlist. (Johnston Decl. ¶¶ 37, 16–24.)

moved to CPS in the order in which their transfer orders became effective. (Clayton Decl. ¶ 2, Ex. A at 15.) Patients can ask about their placement on the waitlist and be informed of their position at any time. (Johnston Decl. ¶ 37.)

Legislative approval is required to expand CPS, and DHS cannot shift funds from other parts of its budget to pay for additional beds. (Johnston Decl. ¶ 7.) CPS has been expanded over the last decade to accommodate its population increase from 6 to 145 patients, but it has been a years-long struggle to get legislative approval to fund the expansions. (*Id.* ¶¶ 8–15, 26.) Notably, the legislature and Governor approved DHS's bonding request to provide funds to further expand CPS on June 1, 2023, which should increase bed space once renovation and construction are complete. (*Id.* ¶ 38.)

### C. CPS Resources

Defendants explain that CPS is a resource-intensive program that works best when therapists maintain an 8:1 ratio with patients. (Expert Report at 5.) Given staff shortages, however, the MSOP has permitted therapists to maintain a 12:1 ratio with patients as the "absolute maximum." (*Id.*) According to the MSOP leadership, these staff shortages persist despite significant energy and effort to hire and retain staff for CPS. (Johnston Decl. ¶¶ 27–31.) Defendants fear that further increasing the patient-to-staff ratio at CPS would negatively impact the MSOP staff and patients, not to mention threaten public safety. (*Id.* ¶¶ 32–33, 35.) Indeed, Defendants claim that increasing capacity beyond the ideal ratio would mean that patients would not receive treatment at the frequency and intensity of their individual needs; that therapists' ability to run group therapy sessions

and to have personal contact with each patient would be limited; and that there would be a lack of resources to allow for reintegration outings in the community. (*Id.* ¶ 32.) There is also a risk that patients will require more time to complete their treatment, which could create "increased hopelessness" due to slowed progression. (*Id.*) Increasing capacity may also decrease staff morale, which could create greater attrition amongst staff and put the MSOP out of compliance with licensing requirements and state regulations. (*Id.* ¶¶ 33–34.)

Plaintiffs were each approved by the CAP for transfer to CPS. (2nd Am. Compl. ¶¶ 3–11.) Each Plaintiff has now been transferred to CPS, though they all experienced delays of varying lengths when awaiting transfer. (*Id.*; Johnston Decl. ¶¶ 16–24.)

II.   **PROCEDURAL HISTORY**

This action, originally filed in state court, was removed to this Court on March 1, 2023. (Notice of Removal, Docket No. 1.) The original complaint asserted claims for violations of procedural and substantive due process and requested a writ of mandamus. (*See generally* Notice of Removal, Ex. 1.) After two rounds of motions to dismiss, one of which addressed amended claims against Defendants in their individual and official capacities, the Court dismissed all of the claims except the procedural due process claim against Defendants in their official capacities. *Rud v. Johnston*, No. 23-486, 2023 WL 6318615, at *13 (D. Minn. Sept. 28, 2023); *Rud v. Johnston*, No. 23-486, 2024 WL 2411577, at *6 (D. Minn. May 23, 2024). Thereafter, Plaintiffs filed a Second Amended Complaint that named additional individuals as Plaintiffs who, at that time, were still awaiting

transfer to CPS. (*See* 2nd Am. Compl. ¶¶ 9–11.) Plaintiffs and Defendants cross moved for summary judgment on April 1, 2025. (Pls.' Mot. Summ. J., Defs.' Mot. Summ. J., Docket Nos. 142, 147.)

## DISCUSSION

### I.   STANDARD OF REVIEW

Summary judgment on a claim or defense is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

## II. ANALYSIS

The cross motions for summary judgment center around two issues: (1) whether this case is moot, and (2) whether Defendants complied with procedural due process.

### A. Mootness

The Court has jurisdiction over actual "Cases" or "Controversies." U.S. Const., art. III, § 2. A case or controversy ceases to exist, and a case becomes moot, when "the issues presented are no longer live or the parties lack a cognizable interest in the outcome." *Brazil v. Ark. Dep't of Hum. Servs.*, 892 F.3d 957, 959 (8th Cir. 2018).

Because all Plaintiffs have now been transferred to CPS, Defendants argue that this action is now moot. However, the Court finds that the capable-of-repetition-yet-evading-review exception to mootness applies. The capable-of-repetition-yet-evading-review exception applies when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Whitfield v. Thurston*, 3 F.4th 1045, 1047 (2021) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). Because they are invoking the exception, Plaintiffs bear the burden of showing that the exception applies. *Id.*

The first element—that Plaintiffs had too little time to litigate their claim before being transferred to CPS—is clearly met. Courts have applied the exception to a 12-month imprisonment, *Turner v. Rogers*, 564 U.S. 431, 440 (2011), and an 18-month period of time to challenge a referendum on a constitutional amendment, *First Nat'l Bank of*

*Boston v. Bellotti*, 435 U.S. 765, 774 (1978).  Here, Plaintiff Rud was transferred after 10 months of being on the waitlist, and the other Plaintiffs were transferred after being on the waitlist for six to nine months.  Thus, the duration of Plaintiffs' delay in transfer to CPS was too short to be fully litigated before Plaintiffs were transferred to CPS.

The second element—whether there is a reasonable expectation that Plaintiffs will be subjected to the same action again—is also satisfied.  Plaintiffs' CPS status can be revoked at any time by the MSOP Executive Director.  *See* Minn. Stat. § 253D.29, subd. 3(a) (providing that the Executive Director "may revoke a transfer . . . and require a committed person to return to a secure treatment facility" for safety reasons or if the person "has regressed in clinical progress").  Though Plaintiffs did not file specific evidence of the Executive Director exercising this power to revoke, at the motion hearing on August 14, 2025, Plaintiffs described anecdotal evidence of CPS patients being revoked from CPS.  Plus, the evidence suggests that CPS will continue to suffer from empty bed and staff shortages for some time, thus demonstrating a pattern of MSOP patients with valid, effective transfer orders being delayed in their transfer to CPS.  *Cf. Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 594 & n.6 (1999) (holding case was not moot where persons seeking treatment in community settings had histories of treatment in multiple institutional settings).  In fact, other MSOP patients have recently filed a nearly identical action alleging that Defendants failed to transfer them to CPS within a reasonable amount of time following a final, effective transfer order.  (*See* Decl. of Daniel E. Gustafson

("Gustafson Decl.") ¶ 3, Ex. A (Complaint for *Navratil v. Johnston*), Apr. 1, 2025, Docket No. 145.) Plaintiffs cannot formally invoke the class action exception to mootness because the Court previously denied class certification without prejudice. *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975); *Rud*, 2023 WL 6318615, at *13. But the *Navratil* case nonetheless exemplifies how delay in transfer under the current circumstances is not merely a "physical or theoretical possibility," but a reasonable expectation. *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). The combination of the above circumstances leads the Court to conclude that there is a reasonable expectation that Plaintiffs will be subjected to delays in transfer should their CPS status be revoked.

In sum, Plaintiffs have met their burden of showing that the capable-of-repetition-yet-evading-review exception to mootness applies. Plaintiffs have demonstrated that their delay in transfer to CPS is too short to be fully litigated before being transferred to CPS, and that there is a reasonable expectation that they will be subjected to delays in transfer should their CPS status be revoked. Thus, this case is not moot.

### B. Procedural Due Process

"To set forth a procedural due process violation, a plaintiff, first, must establish that his protected liberty or property interest is at stake." *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 817 (8th Cir. 2011) (citation omitted). If a plaintiff establishes that he has been deprived of a protected liberty or property interest, then the Court determines what process is due. *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006).

Here, the Court finds that Plaintiffs have a protected liberty and property interest in being transferred to CPS within a reasonable amount of time. *McDeid v. Johnston*, 984 N.W.2d 864, 877–79 (Minn. 2023); *see Rud*, 2023 WL 6318615, at *5–6. The remaining issues are whether Plaintiffs were deprived of that protected interest, and whether Defendants provided sufficient process.[4]

### 1. Deprivation

The first issue is whether Plaintiffs were deprived of their interest in being transferred to CPS within a reasonable amount of time following a valid, effective transfer order. The Court finds the record on this matter inconclusive.

To start, Defendants argue that a temporary inability to comply with a transfer order does not amount to a constitutional deprivation. In support, Defendants cite to cases where courts have held that a temporary delay in collecting a money judgment does not constitute deprivation of a property interest. *E.g.*, *Louisiana ex rel. Folsom v. City of New Orleans*, 109 U.S. 285, 289 (1883) ("A party cannot be said to be deprived of his property in a judgment because at the time he is unable to collect it."). But such cases are inapposite. The interest at stake in *Folsom*—the temporary loss of a money judgment—is drastically distinct from the interests at stake here—the delay in being transferred to a less restrictive treatment facility. Unlike a temporary loss of a money

---

[4] Defendants also challenge the characterization of Plaintiffs' due process claim as procedural instead of substantive, arguing that Plaintiffs are not actually seeking additional process but rather an absolute entitlement to earlier transfer. The Court plainly disagrees.

judgment, where the money can be recovered in full eventually, MSOP patients cannot get lost time back due to any delay in transfer.  This distinction is critical.  Any delay in transfer prolongs MSOP patients' confinement to more restrictive treatment facilities and, as alleged by Plaintiffs, functionally prolongs their civil commitment in the MSOP altogether.  The Court finds it clear that Plaintiffs are entitled to be transferred to CPS within a reasonable amount of time, and that an unreasonable delay deprives them of that interest.

However, it is less clear what constitutes a "reasonable amount of time." Reasonableness is a question of fact to be determined by the Court based on the individual circumstances of the case. *Glacial Plains Coop. v. Chippewa Valley Ethanol Co.*, 912 N.W.2d 233, 237 (Minn. 2018); *McDeid*, 984 N.W.2d at 868.  Here, it is apparent that, absent extraordinary circumstances, seven days is a reasonable amount of time to transfer an MSOP patient to CPS. (Gustafson Decl. ¶ 4, Ex. B ("Johnston Dep.") at 38:7– 39:7; *id.* ¶ 5, Ex. C at 48:21–25; *id.* ¶ 6, Ex. D at 18:16–22.)  But it is unclear whether the MSOP's lack of empty beds and staff shortage problems are extraordinary circumstances that blur the line between what is and is not a reasonable amount of time to transfer an MSOP patient to CPS.  On the one hand, Plaintiffs argue that seven days is reasonable. Yet on the other, Defendants contend that any amount of time it takes to transfer a patient to CPS is reasonable given the bed space and staffing complications that prevent earlier transfer.  In the Court's view, neither party has met its burden at summary

judgment of demonstrating that there are no genuine issues of material fact regarding reasonableness. Fed. R. Civ. P. 56(a). The evidence does not conclusively establish what amount of time is reasonable to transfer an MSOP patient to CPS when there are not enough empty, staffed beds available. There is also a lack of guidance from the Minnesota Supreme Court on this particular question. *See McDeid*, 984 N.W.2d at 868 ("What amount of time is reasonable in any given set of circumstances is an issue of fact to be determined by the district court."). As such, there remains a genuine dispute of fact over what constitutes a reasonable amount of time. There thus remains a genuine dispute over whether Plaintiffs were deprived of their protected interest.

### 2. Process

The final issue is whether, if Plaintiffs were deprived of their protected interest, Defendants complied with procedural due process. The Court finds that they did not.

If a plaintiff establishes that he has been deprived of a protected interest, then the Court must next "consider what process is due by balancing the specific interest that was affected, the likelihood that the [MSOP] procedures would result in an erroneous deprivation, and the [MSOP's] interest in providing the process that it did, including the administrative costs and burdens of providing additional process." *Senty-Haugen*, 462 F.3d at 886 (citing *Mathews v. Eldridge*, 424 U.S. 319, 332–35 (1976)). It is important to note that due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews*, 424 U.S. at 334

(quotation omitted). Rather, it "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

First, the Plaintiffs' protected interest in being transferred to CPS within a reasonable amount of time following a valid, effective transfer order carries heavy weight. As mentioned, any delay in transfer to CPS necessarily means that an MSOP patient is forced to endure more time in a more restrictive treatment facility. In addition, any delay could functionally mean a prolonged period of civil commitment in the MSOP. The Court recognizes that a delay in transfer would not necessarily deprive an MSOP patient "of the very means by which to live while he waits" to be transferred. *See Goldberg v. Kelly*, 397 U.S. 254, 264 (1970). But an unreasonable delay is much more substantial than, for example, the lost use of a $25 booking fee that can later be reobtained if the deprivation was erroneous. *See Mickelson v. County of Ramsey*, 823 F.3d 918, 924 (8th Cir. 2016). As such, the Court finds that Plaintiffs' interest in being transferred to CPS within a reasonable time to be substantial.

Second, the MSOP's interest in restricting the movement of MSOP patients at CPS based on available bed space and staffing numbers is also significant. The record clearly demonstrates that the MSOP is struggling to keep up with the number of MSOP patients who have received valid, effective orders to be transferred to CPS. The limited bed space and staffing shortage problems have made it difficult for the MSOP to maintain its desired 8:1 ratio of therapists-to-patients and instead have stretched the program to a 12:1 ratio.

The Court recognizes the weight of the MSOP's interest in prioritizing the treatment needs of its patients with CPS's capacity to provide that treatment in a safe manner. *See Senty-Haugen*, 462 F.3d at 887 (recognizing the security of the MSOP as a key state interest).

Finally, the last balancing factor requires the Court to evaluate "the likelihood that the [MSOP] procedures would result in an erroneous deprivation." *Id.* at 886. Defendants did not provide Plaintiffs with any procedure to challenge their delay in transfer to CPS following a valid, effective transfer order. (Johnston Dep. at 40:9–24.) This lack of process or procedure increases the likelihood of an erroneous deprivation.

Defendants argue that the waitlist itself and the post-deprivation procedures available to Plaintiffs (e.g., contempt proceedings) are sufficient process because Plaintiffs' delay in being transferred to CPS was only temporary. But procedural due process requires "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"). And here, Defendants provide Plaintiffs with no process at all. The waitlist may serve as an efficient mechanism to transfer MSOP patients to CPS based on which patient's transfer order effectuated first. But there is no opportunity for Plaintiffs to be heard. The only procedure Defendants point to through which Plaintiffs may challenge their delay in

-16-

transfer to CPS following a valid, effective transfer order comes in the form of contempt proceedings, but the Court has already rejected such proceedings as sufficient process. *See Rud*, 2023 WL 6318615, at *6 n.3.

Defendants also contend that no pre-deprivation hearing is required because of the temporary deprivation of the Plaintiffs' particular interest. They liken Plaintiffs' interest to that found to be insufficient to warrant a pre-deprivation hearing in *Mathews*, where plaintiffs challenged the termination of Social Security disability benefits without an evidentiary hearing. 424 U.S. at 323. Distinguishing between the loss of welfare benefits at issue in *Goldberg*, which did warrant a pre-deprivation hearing, *see* 397 U.S. at 263–64, the *Mathews* court found that the temporary loss of disability benefits was less significant and did not require a pre-deprivation hearing because other resources could support individuals in financial need whose disability benefits were terminated. 424 U.S. at 341–43. But Plaintiffs here not only lack pre-deprivation process; they also lack any post-deprivation process. The plaintiffs in *Mathews*—and other cases where plaintiffs' temporary deprivations did not require a pre-deprivation hearing—at least had post-deprivation procedures available to challenge the temporary deprivation. *See Mathews*, 424 U.S. at 338; *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 263 (1987); *Gilbert v. Homar*, 520 U.S. 924, 932 (1997); *Mickelson*, 823 F.3d at 926. Here, by contrast, there is no procedure at all to challenge the delay in transfer to CPS following a valid, effective transfer order.

Balancing the above interests, the Court concludes that the MSOP's lack of procedure for patients to challenge their placement on the waitlist to be transferred to CPS does not comply with procedural due process. Plaintiffs must have some minimal opportunity to be heard. Defendants have failed to provide any "check against mistaken decisions." *Brock*, 481 U.S. at 264. But Defendants must provide at least some minimal process after giving Plaintiffs notice that they are being placed on the waitlist to be transferred to CPS, through which Plaintiffs can challenge their placement on the waitlist.

\* \* \*

Because there remains a genuine dispute of fact over what constitutes a reasonable amount of time, and thus whether Plaintiffs were deprived of their protected interest, the Court will deny the Plaintiffs' motion for summary judgment. And because the MSOP's lack of procedure for patients to challenge their placement on the waitlist to be transferred to CPS does not comply with procedural due process, the Court will deny the Defendants' motion for summary judgment.

## CONCLUSION

The parties filed cross motions for summary judgment on the Plaintiffs' sole remaining claim for violation of procedural due process. Because there remains a genuine issue of fact over what constitutes a reasonable amount of time to transfer an MSOP patient to CPS (and thus, whether MSOP transferred Plaintiffs within a reasonable amount of time to satisfy procedural due process), the Court will deny the Plaintiffs' motion.

Because Plaintiffs have met their burden of showing that the capable-of-repetition-yet-evading-review exception to mootness applies, this case is not moot. Accordingly, the Court will deny Defendants' summary judgment motion.

Moreover, if Plaintiffs were deprived of their interest in being transferred to CPS within a reasonable amount of time following a valid, effective transfer order, the Court finds that the MSOP's lack of procedure for patients to challenge their placement on the waitlist to be transferred to CPS does not comply with procedural due process.

The issue for trial is whether Plaintiffs have been deprived of their protected interest in being transferred to CPS within a reasonable amount of time, which depends on what constitutes a "reasonable amount of time."

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment [Docket No. 142] is **DENIED**; and

2. Defendants' Motion for Summary Judgment [Docket No. 147] is **DENIED**.


DATED:  September 12, 2025            _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                  JOHN R. TUNHEIM
                                      United States District Judge