**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

JAMES JOHN RUD, BRIAN KEITH HAUSFELD, JOSHUA ADAM GARDNER, ANDREW GARY MALLAN, DWANE DAVID PETERSON, and LYNELL DUPREE ALEXANDER, *on behalf of themselves and all others similarly situated*; THOMAS WEBBER, KENNETH DONALD HAND, and RICKY DURBIN,

Plaintiffs,

v.

NANCY JOHNSTON, *Executive Director, Minnesota Sex Offender Program*; and JOHN CONNOLLY, *Temporary Commissioner of the Department of Human Services,*[1] *both in their individual and official capacities*,

Defendants.

Civ. No. 23-486 (JRT/ECW)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL**

---

Daniel E. Gustafson and Gabrielle Kolb, **GUSTAFSON GLUEK PLLC**, 120 South Sixth Street, Suite 2600, Minneapolis, MN 55402, for all Plaintiffs.

Abou Amara, Jr., and Joseph Nelson, **GUSTAFSON GLUEK PLLC**, 120 South Sixth Street, Suite 2600, Minneapolis, MN 55402, for Plaintiffs James John Rud, Brian Keith Hausfeld, Joshua Adam Gardner, Andrew Gary Mallan, Dwane David Peterson, and Lynell Dupree Alexander.

Anthony Stauber and David A. Goodwin, **GUSTAFSON GLUEK PLLC**, 120 South Sixth Street, Suite 2600, Minneapolis, MN 55402; Hannah L.

---

[1] Automatically substituted for Shireen Gandhi pursuant to Fed. R. Civ. P. 25(d).

Scheidecker, **FREMSTAD LAW**, 3003 Thirty-Second Avenue South, Suite 240, P.O. 3143, Fargo, ND 58103, for Plaintiffs James John Rud and Brian Keith Hausfeld.

João C.J.G. De Medeiros, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suites 600, Saint Paul, MN 55101, for Defendants.

Plaintiffs John James Rud, Brian Keith Hausfeld, Yeshua (formerly known as Joshua) Adam Gardner, Dwane David Peterson, Lynell Dupree Alexander, Andrew Gary Mallan, Kenneth Hand, Ricky Durbin, and Thomas Webber (collectively "Plaintiffs") are civilly committed to the Minnesota Sex Offender Program ("MSOP"). Each Plaintiff received a Commitment Appeal Panel ("CAP") order to be transferred to a less-restrictive MSOP facility called Community Preparation Services ("CPS"). Plaintiffs brought this action against Nancy Johnston and Shireen Gandhi[2] (collectively "Defendants") under 42 U.S.C. § 1983, arguing that their transfer to CPS was delayed in violation of their right to procedural due process. Plaintiffs allege that those who hold a valid transfer order have a protected liberty and property interest in being transferred to CPS within a reasonable amount of time and that Defendants violated the Due Process Clause by depriving them of that interest without sufficient process.

[2] Gandhi has since been replaced by temporary DHS Commissioner John Connolly.

The Court previously denied summary judgment to both parties on Plaintiffs' procedural due process claim,[3] but in doing so, concluded that: (1) this case is not moot; (2) Plaintiffs have a protected liberty and property interest in transfer within a reasonable time following a valid CPS transfer order; and (3) that if Plaintiffs were deprived of that protected interest, Defendants had not provided them sufficient process. This left one question ripe for trial: whether Plaintiffs were transferred to CPS within a reasonable time. On June 15 and 16, 2026, the Court held a two-day bench trial on this question.

Having thoroughly reviewed the record and the parties' arguments, and having made findings of fact and conclusions of law as set forth below, the Court concludes that Plaintiffs were not transferred to CPS within a reasonable time and thus were deprived of their protected liberty and property interests in violation of their right to procedural due process. The Court will therefore direct judgment to be entered in favor of Plaintiffs on Count Two of their Amended Complaint.

[3] Plaintiffs initially brought multiple other claims, but all except the procedural due process claim were dismissed prior to summary judgment.

## FINDINGS OF FACT

### I. BACKGROUND

#### A. Procedural History

1. Plaintiffs are indefinitely civilly committed to the MSOP pursuant to Minn. Stat. §§ 253D and 246C.13. (Stipulated Facts ("Fact Stip.") ¶ 34, June 12, 2026, Docket No. 210.)

2. Each Plaintiff has received orders from the CAP for their transfer to CPS.

3. Plaintiffs Rud and Hausfeld filed this action in state court, and the case was removed to this Court on March 1, 2023. (*See* Docket No. 1.)

4. At the time of filing, Plaintiff Rud had not been transferred to CPS even though his transfer had been approved more than eight months earlier. (Compl. ¶¶ 1, 20–21, Feb. 21, 2023, Docket No. 1–1.)

5. Plaintiff Hausfeld had been transferred to CPS when the original complaint was filed but his transfer was also delayed by more than nine months. (*Id.* ¶¶ 3, 22–23.)

6. Plaintiffs Rud and Hausfeld sought to represent two classes of individuals who were approved for CPS transfer: those who were awaiting transfer and those who had been transferred after a delay. (*Id.* ¶ 25.)

7. Plaintiffs Rud and Hausfeld asserted four claims. Count I sought a writ of mandamus ordering Defendants to immediately comply with all effective CAP orders and to transfer Plaintiff Rud and class members to CPS pursuant to those

orders. (*Id.* ¶¶ 34–40.). Count II asserted that Defendants violated Plaintiffs' procedural due process rights under the United States and Minnesota Constitutions by depriving them of transfer to CPS without any meaningful process. (*Id.* ¶¶ 41–51.) Count III also asserted Defendants violated procedural due process under the United States and Minnesota Constitutions by depriving Plaintiffs of reintegration treatment at CPS—which Plaintiffs alleged is necessary for their discharge from commitment at MSOP—without meaningful process. (*Id.* ¶¶ 52–63.) Count IV asserted Defendants violated Plaintiffs' substantive due process rights under the United States and Minnesota Constitutions by failing to transfer them for months or years in violations of CAP transfer orders. (*Id.* ¶¶ 64–69.)

8. On March 6, 2023, Rud filed a motion for a temporary restraining order or preliminary injunction compelling Defendants to effectuate his CAP transfer order. *See Rud v. Johnston*, Civ. No. 23-486, 2023 WL 2600206 at *3 (D. Minn. Mar. 22, 2023) ("TRO Order"). The Court found that Rud was likely to succeed on his procedural due process claim (Count Two), concluding that MSOP patients had a protected liberty interest in the "right to be transferred to CPS within a reasonable time from when the CAP orders their transfer," and that Defendants deprived Rud of that right "by delaying his transfer for nine months, without providing him with meaningful procedures to protect that right and enforce his transfer." *Id.* at *6–7.

Finding the other requirements for a preliminary injunction satisfied, the Court ordered Defendants to transfer Rud to CPS within fifteen days from the date of the order. *Id*. at *10.

9. Defendants appealed the preliminary injunction to the Eighth Circuit Court of Appeals (Docket No. 38) and filed a motion to stay the preliminary injunction (Docket No. 39). The Court denied the motion to stay. *Rud v. Johnston*, Civ. No. 23-0486, 2023 WL 2760533 (D. Minn. Apr. 3, 2023).

10. The Defendants also filed a motion to stay with the Eighth Circuit Court of Appeals. Mot. to Stay, *Rud v. Johnston,* No. 23-1577 (8th Cir. Mar. 31, 2023). The Eighth Circuit temporarily stayed the Court's preliminary injunction while the parties submitted briefs. *Rud v. Johnston,* No. 23-1577 (8th Cir. filed April 4, 2023). But about a week later, Defendants withdrew their motion to stay, informing the Eighth Circuit that "Plaintiff-Appellee James John Rud was transferred to CPS in the normal course of waiting list movement." Mot. to Withdraw at 1, *Rud v. Johnston,* No. 23-1577 (8th Cir. April 12, 2023). On April 25, 2023, Plaintiffs filed a motion for summary disposition, which the Eighth Circuit granted. *Rud v. Johnston*, No. 23-1577, 2023 WL 6232055 (8th Cir. May 8, 2023).

11. On March 8, 2023, Plaintiffs brought a Motion to Certify the Awaiting Transfer and Delayed Transfer classes. (Docket No. 15.) On the same day, Defendants brought a Motion to Dismiss. (Docket No. 21.) The Court ruled on both motions in *Rud v.*

*Johnston*, Civ. No. 23-486, 2023 WL 6318615 (D. Minn. Sept. 28, 2023) ("Mot. Dismiss Order"). The Court granted Defendants' motion to dismiss as to Counts I, III, and IV. *Id.* at *13. The Court denied Defendants' motion to dismiss as to Count II, finding that Plaintiffs had a protected liberty interest "in the timely effectuation of their transfer orders" and a protected property interest deriving from "MSOP patients' valid CAP transfer orders" which "set a standard that the MSOP must follow: transfer to CPS within a reasonable time after the issuance of a valid CAP transfer order." *Id.* at *5–6. The Court denied Plaintiffs' motion to certify classes without prejudice. *Id.* at *13.

12. On September 23, 2024, Plaintiffs filed their Second Amended Complaint (Docket No. 136), which added several Plaintiffs who as of filing had received CAP transfer orders but had not been transferred.

13. Following discovery, the parties filed cross-motions for summary judgment on April 1, 2025. (Docket Nos. 142, 147.)

14. On September 12, 2025, the Court denied both motions. *Rud v. Johnston*, Civ. No. 23-486, 2025 WL 2636455 (D. Minn. Sept. 12, 2025) ("Summ. J. Order"). The Court narrowed the issues for trial by concluding the following:

    a. Plaintiffs' claims were not moot under the capable-of-repetition-yet-evading-review exception. (*Id.* at *3–4.)

b. Plaintiffs have a protected liberty and property interest in being transferred to CPS within a reasonable amount of time. (*Id*. at *5.)

c. An unreasonable delay in their transfer to CPS deprives Plaintiffs of their protected liberty and property interests. (*Id.*)

d. Absent extraordinary circumstances, seven days is a reasonable amount of time to transfer an MSOP patient to CPS. (*Id.*)

e. Defendants did not provide Plaintiffs with any process to challenge their delay in transfer to CPS, and contempt proceedings are not sufficient. (*Id.* at *7.)

f. Trial was necessary to determine whether Plaintiffs had been deprived of their protected interest in being transferred to CPS within a reasonable amount of time. The answer to this question would depend on what constitutes a "reasonable amount of time." (*Id.* at *7–8.)

**B. The Parties**

15. James John Rud is indefinitely civilly committed to MSOP pursuant to Minn. Stat. §§ 253D and 246B.02. (Fact Stip. ¶ 34.) Rud petitioned for reduction in custody on June 26, 2020. (Plaintiffs' Exhibit ("Pls. Ex.") 1 at 2.)[4] On June 6, 2022, CAP granted his petition for transfer to CPS effective after the 15-day statutory stay. (*Id.* at 14.) There was no appeal of the CAP order to the Minnesota Court of

[4] Plaintiffs provided a list of these exhibits on March 9, 2026. (Docket No. 187.)

Appeals. (Fact Stip. ¶ 36.) Rud was placed on a waitlist for transfer to CPS and was transferred on April 11, 2023. (*Id.*) From the expiration of the statutory stay, Rud waited 294 days to be transferred.

16. Plaintiff Brian Keith Hausfeld is indefinitely civilly committed to MSOP. (*Id*. ¶ 34.) Plaintiff Hausfeld petitioned for reduction in custody, and on January 25, 2022, CAP granted his petition for transfer to CPS, to be effective after the 15-day statutory stay. (Pls. Ex. 2.) MSOP appealed the order, but the appeal was dismissed by stipulation on June 21, 2022. (Fact Stip. ¶ 35.) Hausfeld was placed on a waitlist for transfer to CPS and was transferred on November 8, 2022. (Fact Stip. ¶ 35.) From the date that the appeal was dismissed, Plaintiff Hausfeld waited 140 days to be transferred.

17. Plaintiff Yeshua (formerly known as Joshua) Adam Gardner is indefinitely civilly committed to MSOP. (*Id*. ¶ 34.) Gardner petitioned for reduction in custody on March 21, 2021. (Pls. Ex. 4.) On May 5, 2023, CAP granted his petition for transfer to CPS effective after the 15-day statutory stay. (*Id.*) There was no appeal to the Minnesota Court of Appeals. (Fact Stip. ¶ 37.) Gardner was placed on a waitlist for transfer to CPS. (*Id.*) On August 19, 2023, Gardner filed a motion for contempt against Defendants for failing to transfer him within a reasonable time. (*Id*.) The CAP found that Gardner made a prima facie showing of contempt and ordered a

second stage contempt hearing. (Fact Stip. ¶ 37). Before the completion of the contempt proceedings, however, Gardner was transferred to CPS. (*Id.*)

18. Plaintiff Dwane David Peterson is indefinitely civilly committed to MSOP. (*Id*. ¶ 34.) Peterson petitioned for reduction in custody on October 12, 2023. (Pls. Ex. 6.) On October 16, 2023, CAP granted his petition for transfer to CPS effective after the 15-day statutory stay. (Fact Stip. ¶ 39.) There was no appeal to the Minnesota Court of Appeals. (*Id.*) Peterson was placed on a waitlist for transfer to CPS and was transferred on May 1, 2024. (*Id*.) From the expiration of the statutory stay, Peterson waited 183 days to be transferred.

19. Plaintiff Lynell Dupree Alexander is indefinitely civilly committed to MSOP. (*Id*. ¶ 34.) Alexander petitioned for reduction in custody on August 27, 2020. (Pls. Ex. 3.) On July 11, 2023, CAP granted his petition for transfer to CPS effective after the 15-day statutory stay. (Fact Stip. ¶ 38.) There was no appeal to the Minnesota Court of Appeals. (*Id.*) Alexander was placed on a waitlist for transfer to CPS and was transferred on February 26, 2024. (*Id*.) From the expiration of the statutory stay, Alexander waited 215 days to be transferred.

20. Plaintiff Andrew Gary Mallan is indefinitely civilly committed to MSOP. (*Id*. ¶ 34.) Mallan petitioned for reduction in custody on June 10, 2022. (Pls. Ex. 5.) On October 25, 2023, CAP granted his petition for transfer to CPS effective after the 15-day statutory stay. (Fact Stip. ¶ 40.) There was no appeal to the Minnesota

Court of Appeals. (*Id.*) Mallan was placed on a waitlist for transfer to CPS and was transferred on June 3, 2024. (*Id*.) From the expiration of the statutory stay, Mallan waited 207 days to be transferred.

21. Plaintiff Kenneth Hand is indefinitely civilly committed to MSOP. (*Id*. at ¶ 34.) Hand petitioned for reduction in custody on April 15, 2021. (Pls. Ex. 8.) On February 7, 2024, CAP granted his petition for transfer to CPS effective after the 15-day statutory stay. (Fact Stip. ¶ 41.) There was no appeal to the Minnesota Court of Appeals. (*Id.*) Hand was placed on a waitlist for transfer to CPS and was transferred on November 13, 2024. (*Id*.) From the expiration of the statutory stay, Hand waited 265 days to be transferred.

22. Plaintiff Ricky Durbin is indefinitely civilly committed to MSOP. (*Id*. ¶ 34.) Durbin petitioned for reduction in custody on January 24, 2022. (Pls. Ex. 7.) On February 22, 2024, CAP granted his petition for transfer to CPS effective after the 15-day statutory stay. (Fact Stip. ¶ 42.) There was no appeal to the Minnesota Court of Appeals. (*Id.*) Durbin was placed on a waitlist for transfer to CPS and was transferred on November 13, 2024. (*Id*.) From the expiration of the statutory stay, Durbin waited 250 days to be transferred.

23. Plaintiff Thomas Webber is indefinitely civilly committed to MSOP. (*Id*. ¶ 34.) Webber petitioned for reduction in custody on April 21, 2022. (Pls. Ex. 9.) On July 26, 2024, CAP granted his petition for transfer to CPS effective after the 15-day

statutory stay. (Fact Stip. ¶ 43.) There was no appeal to the Minnesota Court of Appeals. (*Id.*) Webber was placed on a waitlist for transfer to CPS and was transferred on January 28, 2025. (*Id.*) From the expiration of the statutory stay, Webber waited 171 days to be transferred.

24. Defendant Nancy Johnston is the Executive Director of MSOP. (Tr. Vol. 1 at 49:23–24, June 29, 2026, Docket No. 219.) Johnston oversees MSOP. (*Id*. at 50:4–7.)

25. Shireen Gandhi was the temporary commissioner of DHS during most of the events giving rise to this litigation and was responsible under Minnesota law for establishing and maintaining MSOP. Minn. Stat. § 246C.13. John Connolly is presently the temporary commissioner of DHS and has been automatically substituted as a Defendant pursuant to Fed. R. Civ. P. 25(d).

## II. THE MINNESOTA SEX OFFENDER PROGRAM

### A. Structure of MSOP

26. The Minnesota Commitment and Treatment Act provides for the indefinite civil commitment of sex offenders to the Minnesota Sex Offender Program ("MSOP"). Minn. Stat. §§ 253D.01–253D.36; *see also id.* § 253D.07, subds. 3, 4.

27. Under the Minnesota Commitment and Treatment Act, a court may order the commitment of individuals categorized as a Sexually Dangerous Person or a person with a Sexually Psychopathic Personality. Minn. Stat. § 253D.07, subd. 4; *id.* § 253D.02, subds. 15, 16.

28. All individuals civilly committed in Minnesota as a Sexually Dangerous Person or with a Sexually Psychopathic Personality enter the MSOP treatment program, with the possible exception of individuals dually committed as both mentally ill and dangerous and as some combination of sexually dangerous person and sexual psychopathic personality. (Fact Stip. ¶ 2.)

29. The stated goal of the MSOP is to treat and safely reintegrate committed individuals back into the community by providing them treatment "best adapted . . . to rendering further supervision unnecessary," and allowing discharge into the community. Minn. Stat. § 253B.03, subd. 7.

30. MSOP is led by its Executive Director, Johnston, and the Minnesota Department of Direct Care and Treatment ("DCT") Executive Board exercises ultimate authority over MSOP. (Fact Stip. ¶ 3.) MSOP was a program under DHS until 2024; during that time, the Commissioner of DHS and the MSOP Executive Director had ultimate authority over MSOP. (*Id*. ¶¶ 1, 3)

31. By statute, the DCT Executive Board has ultimate authority over operational and treatment decisions. Minn. Stat. § 246C.13. Moreover, the DCT Executive Board is statutorily required to provide "specialized sex offender assessment, diagnosis, care, treatment, supervision, and other services to civilly committed sex offenders" including "specialized programs at secure facilities," "consultative services,

aftercare services, community-based services and programs, transition services, or other services consistent with the mission of Direct Care and Treatment." *Id.*

32. Treatment at MSOP takes place in three phases and all individuals committed to MSOP typically begin their treatment at Phase I. (Fact Stip. ¶ 12.) The only MSOP facilities are secure treatment locations at Moose Lake and St. Peter and a Community Preparation Services ("CPS") facility at St. Peter. (*Id.* ¶ 4.)

33. CPS is the only non-secure facility operated by MSOP. (*Id.* ¶ 17.) CPS is an unlocked, residential setting outside the secure perimeter at MSOP's St. Peter campus. (*Id.* ¶ 15.)

34. The Moose Lake facility is the most restrictive facility and houses individuals in the early stages of their treatment. (Pls. Ex. 46 at 2.) The secure St. Peter facility is designated for committed individuals in later stages of treatment and for individuals with special needs, such as individuals with cognitive disabilities, individuals with severe mental illness, or vulnerable adults. (Pls. Ex. 46 at 3.) Some patients, such as those that are disabled or elderly, are in the "Alternative Program" at MSOP which is located in the secure facility in St. Peter. (*Id.*)

**B. Community Preparation Services**

35. Minnesota Statute provides that MSOP shall operate or administer Community Preparation Services, which are "specialized residential services or programs . . . outside of a secure treatment facility." Minn. Stat. § 246B.01, subd. 2(a). The statute does not describe the facilities that must be used as part of CPS, nor does

it place any limitations on the number, type, structure, or location of the facilities to be used for CPS. *See id.*

36. Rather, when appropriate, MSOP is authorized to transfer committed individuals out of a secure treatment facility "to a facility under the control of the executive board." Minn. Stat. § 253D.29, subd. 1(a). (*See also* Pls. Ex. 66 (*In re Lenz,* Appeal Panel No. AP19-9091, Findings and Order, June 19, 2020) at 9 ("There is nothing in the statute [Minn. Stat. § 253D.29] that requires transfer to the CPS program that MSOP has created as the only option for MSOP clients. There is nothing in the statute that requires building a new facility to fulfill the transfer requirements.") (internal quotations omitted)).

37. The CPS facilities are "designed to assist civilly committed sex offenders in developing the appropriate skills and resources necessary for an eventual successful reintegration into a community." Minn. Stat. § 246B.01, subd. 2a.

38. Transfer to CPS is statutorily designated as a "reduction in custody." Minn. Stat. §§ 246B.01, subd. 2a; 253D.27, subd. 1(b); 253D.29.

39. The focus of treatment at CPS is on deinstitutionalization and reintegration into a community. *See* Minn. Stat. § 246B.01; (*see also* Tr. Vol. 1 at 26: 6–8.)

40. Individuals at CPS are afforded increased liberties compared to those at Moose Lake or the secure St. Peter facility. (Tr. Vol. 1 at 28:8–17.) Some of the liberties available at CPS that are unavailable at other MSOP facilities include the ability to

attend doctor's appointments without being physically restrained (*id*. at 26:19–27:4), play disc golf (*id*. at29:8–10), practice calligraphy (*id*.), use a stove to cook meals (*id*. at 30:7–15), and volunteer in the community (*id.* at 72:21–73:12; Pls. Ex. 54).

41. These expanded activities, many of which are only available to MSOP detainees at CPS, assist Plaintiffs in their deinstitutionalization and prepare them for a safe and successful move back into the community. (Pls. Ex. 22.)

42. Individuals at CPS and some individuals at the secure St. Peter facility can participate in community outings if approved by the individual's treatment team; community outings are unavailable to individuals at Moose Lake. (Fact Stip. ¶ 19.)

43. Virtually all individuals committed to MSOP are transferred to CPS before they are approved for provisional or full discharge, and as a matter of policy and practice, MSOP normally does not support provisional or full discharge for any patient that has not resided in CPS. (*See* Pls. Ex. 64 (*Piper v. Breland*, Appeal Panel No. AP15-9054, Sept. 16, 2016) at ¶¶ 44–45 ("[MSOP Director of Reintegration at MSOP] Dr. Barbo explained that it is unusual for an individual to propose to move to provisional discharge without first having lived at Community Preparation Services" but that the petitioner's "unique set of circumstances . . . led to the petition for provisional discharge, even though Respondent has not lived at CPS.").)

44. Most individuals who have been discharged without CPS are individuals who are in the Alternative Unit. (Defs.' Ex. 48 (Expert Report) at 8 ("Such a placement [at CPS] is deemed irrelevant for clients in the Alternative program, who will all be residing in supervised housing settings in the community without the goal of independent living.")). Some transferees who are transferred from Moose Lake directly to provisional discharge are not in the Alternative Unit but are otherwise severely mentally or physically ill and unable to live unassisted. (*E.g.*, Pls. Exs. 58 (*In re Barnes*, Appeal Panel No. AP92-9096, June 1, 2023), 59 (*In re Anderson*, Appeal Panel No. AP21-9195, Feb. 2, 2022).)

45. Other individuals who have been granted provisional or full discharge without having first been transferred to CPS have similarly unique circumstances such as being juvenile-only offenders. (Pls. Ex. 60 (*In re Uselman*, Appeal Panel No. AP20-9027, Sept. 9, 2021) at ¶ 89 ("[T]here is a lack of evidence to establish that Petitioner needs inpatient sex offender treatment. In fact, every witness testified, to some degree, that MSOP is not the proper setting to meet Petitioner's needs."); Pls. Ex. 61 (*In re Coon*, Appeal Panel No. AP20-9001, May 17, 2021). Provisional discharge without transfer to CPS was also granted to the only woman at MSOP. (Pls. Ex. 62 (*In re Bailey*, Appeal Panel No. AP20-9019, Dec. 14, 2020) ¶ 17 ("Transferring to MSOP's Community Preparation Services (CPS) is contraindicated, as CPS is an all-male program and would not provide the level of

external controls and monitoring that Petitioner requires.").) These individuals with unique factual circumstances are exceptions to the general rule that individuals at MSOP must be transferred to CPS to complete their treatment.

**C. Reduction in Custody Procedures**

46. Individuals committed to MSOP may petition for a reduction in custody, which can take the form of transfer to CPS, provisional discharge, or discharge from commitment. Minn. Stat. §§ 253D.27, subd 1(b); 253D.30–.31.

47. A petition for reduction in custody is first heard by the Special Review Board ("SRB")—a three-member panel created by statute to hear such petitions. Minn. Stat. §§ 253D.04, 253B.22.

48. After the SRB receives a petition, they must hold a hearing and then consider whether transfer is appropriate. The SRB then issues a report to the Commitment Appeal Panel ("CAP") recommending approval or denial of the petition. Minn. Stat. §§ 253B.19, 253D.27, subd. 3, subd. 4; 253D.29, subd. 1.

49. The SRB may recommend approval of one form of reduction in custody but denial of others. (*See, e.g.*, Pls. Ex. 3 (*In re Alexander*, Appeal Panel No. AP21-9196, July 11, 2023) at 1 (noting the SRB recommended that "the petition for transfer be granted and the petition for provisional discharge and discharge be denied").)

50. A petitioner, DHS Commissioners, or certain county attorneys may petition the CAP for reconsideration of an SRB recommendation; any person or these same parties

may oppose a petition for reconsideration. Minn. Stat. § 253D.28, subd. 1(a), subd. 2(b).

51. If there is a petition for reconsideration, the CAP must hold a hearing. *Id.* § 253D.28, subd. 2(b). If no petition for reconsideration is filed, the CAP can either adopt the SRB recommendation or set a hearing date to discuss the petition and consider evidence on the matter. Minn. Stat. § 263D.28, subd. 1(c).

52. The CAP has the exclusive statutory authority to authorize reductions in custody. Minn. Stat. § 253D.27, subd. 2.

53. The petitioner, DCT Executive Board members, or certain county attorneys may appeal a CAP order to the Minnesota Court of Appeals. Minn. Stat. § 253B.19, subd. 5.

54. If a CAP order authorizing transfer to CPS is not appealed, it becomes effective after 15 days. Minn. Stat. § 253D.28, subd. 3.

55. Once the CAP transfer order becomes effective, Defendants are able to transfer clients to CPS within seven days, absent any issues related to bed space or staffing. (Tr. Vol 1 at 51:11–14.)

56. Johnston has authority to revoke an individual's CPS status. (*Id*. at 76: 7–10); Minn. Stat. § 253D.29, subd. 3(a) (the Executive Director "may revoke a transfer . . . and require a committed person to return to a secure treatment facility" for safety reasons or if the person "has regressed in clinical progress"). Individuals at CPS

have had their CPS status revoked and have been sent back to the secure MSOP facilities. (Tr. at Vol. 1 at 76:11–12; *see also, e.g.,* Pls. Ex. 69 (*In re Steiner*, Appeal Panel No. AP24-9084, Jan. 27, 2026) at ¶ 19 (describing revocation of transfer to CPS).) Webber, a plaintiff in this case, was sent back to the secure perimeter at St. Peter during the pendency of this litigation. (Tr. Vol. 1 at 200:20–23.)

**D. MSOP'S Use of Waitlist for CPS Transfers**

57. The CAP panel has regularly issued more transfer orders than the number of staffed beds available in CPS. (*Id.* ¶ 28.)

58. MSOP has used a waitlist system to manage the excess transfer orders. (*Id.* ¶ 29.) Clients are placed on the waitlist in order of the effective date of their transfer orders. (*Id.*)

59. Staff at either MSOP or the DCT General Counsel's office have maintained and updated the waitlist. (*Id.* ¶ 30.)

60. When an individual is to be placed on the waitlist, the individual receives paperwork notifying them of this fact and of the effective date they would be placed on the waitlist. (*Id.* ¶ 31.) At any time, the individual could request an update on their place on the waitlist using a client request form, which MSOP treated and responded to as a request for data under the Minnesota Government Data Practices Act. (*Id*.)

61. As staffed beds become available, the clients on the waitlist are moved to CPS in the order of their place on the waitlist. (*Id.* ¶ 32.) Clients are moved from the

secure perimeter to CPS within days of a staffed CPS bed becoming available for them. (*Id.*)

62. As of the date of trial, a total of 139 clients were assigned to the 139 staffed beds at CPS. (Fact Stip. ¶ 33.) There were then three clients on the CPS waitlist. (*Id.*)

63. MSOP opened CPS in April 2009. (Fact Stip. ¶ 46.) MSOP has had a waitlist for transfer to CPS every year since at least 2016. (Tr. Vol. 1 at 54:8–11.)

64. MSOP does not provide an opportunity for individuals to challenge their placement on the CPS waitlist prior to MSOP placing them on the waitlist, and no Plaintiff was provided any such opportunity. (Tr. at Vol. 1 at 53: 10–14.)

65. While Plaintiffs were on the waitlist for transfer to CPS, they were not entitled to the additional liberties afforded to individuals at CPS. (*See id*. at 27:5–17; 28:8–17; 29:4–7; 30:12–15.)

66. While an individual is on the CPS waitlist, they are limited in their ability to practice skills that are essential to be eligible for discharge. (*Id*. at 27:18–28: 7; 28:18–29: 7; 29:25–30: 15); *see* Summ. J. Order, 2025 WL 2636455, at *5 ("Any delay in transfer prolongs MSOP patients' confinement to more restrictive treatment facilities and, as alleged by Plaintiffs, functionally prolongs their civil commitment in the MSOP altogether.").

67. Every year from 2015 to 2022, Defendants have represented that CPS transfer orders are being granted at an increased rate. (*See* Tr. Vol. 1. at 55:24–61:11; Pls.

Exs. 22–29 (State of Minnesota Budget Requests 2015–2022).) Yet the number of CAP transfer orders has decreased year-over-year each year from 2016 to 2021. (Tr. Vol. 1 at 61:14–62:4; Pls. Ex. 17.)

68. Defendants track committed individuals' progress through MSOP. (Tr. Vol. 1 at 118:12–14.) Defendants are aware of the number of individuals committed to MSOP (*id.* at 118:15–20), the number of committed individuals in each stage of treatment (*id*. at 119:10–17), the number of individuals who have petitioned to the SRB for reduction in custody (*id*. at 119:18–120:3), the number of individuals for whom SRB has recommended a reduction in custody—whether that is transfer to CPS, provisional, or full discharge (*id*. at 120:20–23), the number of individuals who have received recommendation for reduction in custody for whom MSOP has appealed to CAP (*id*. at 122:6–12), and the number of individuals who have received CAP orders for transfer to CPS (*id*. at 122:14–16).

69. Defendants also track individuals discharged from the program. (*Id.* at 118:24–119:1.) At any given time, Defendants are aware of the number of individuals who have been granted provisional or full discharge (*id*. at 123:20–124:1), the number of individuals who have been granted discharge and who have actually been moved out of MSOP facilities (*id*.), and the number of individuals who have had their discharge revoked (*id*. at 118:24–119:4; 125:19–21).

70. Defendants know or could calculate from existing data the average number of individuals committed to MSOP per year (*id.* at 127:23–128:3), the average time it takes for patients to move between treatment phases (*id*. at 126:8–11), the average number of people per year who petition for a reduction in custody (*id*. at 128:4–6), the average time it takes between when an individual petitions for a reduction in custody to when their SRB hearing is held (*id*. at 126:12–17), the average time it takes between an SRB hearing and the subsequent CAP hearing (*id*. at 126:20–23), the average number of individuals approved for transfer to CPS per year (Pls. Ex. 21), the average time an individual spends committed at MSOP before they are granted a CAP order (Tr. Vol. 1 at 126:24–127:3), and the average number of provisional and full discharges per year (Pls. Ex. 21).

71. Through this data, Defendants have tools to project in advance how many individuals will need housing at CPS and how many beds will be available for this population. (*Id*.) Yet Defendants have not sufficiently expanded CPS nor developed any alternatives for individuals with valid transfer orders, resulting in Defendants consistently maintaining a waitlist. (Fact Stip. ¶ 33.) As a result, Defendants have had at least one individual and as many as 49 individuals on the waitlist—many waiting a year or longer for transfer—since at least 2016. (Fact Stip. ¶ 52; Tr. Vol. 1 at 54:21-24.)

72. Documents offered at trial show that in 2014, Defendants requested waivers of applicable Department of Health standards in order to increase the number of available beds in MSOP facilities. (Pls. Ex. 37.) Those waivers were initially granted on a temporary basis, but Defendants later requested that those waivers be extended "due to delays related to legislative funding" for a renovation project. (*Id*.) There is no indication that Defendants have requested or inquired into further waivers of approval of other CPS facilities in order to house additional individuals with valid transfer orders. (Tr. Vol. 1 at 80:12–19.)

73. A basic projection using some of the metrics detailed above suggests that MSOP will continue to have more individuals with valid CAP orders than available beds at CPS. (Pls. Ex. 21.) There is no reason to believe that, absent a change of policy and practice, MSOP will be able to meaningfully reduce the waitlist in the future.

74. On March 31, 2025, another group of plaintiffs filed a lawsuit alleging that Defendants violated their due process by failing to transfer them within a reasonable time. *See Navratil v. Johnston,* Civ. No. 25-1175, 2025 WL 3043416 (D. Minn. Mar. 31, 2025) (granting in part and denying in part defendants' motion to dismiss).

75. Defendant Johnston has faced contempt proceedings related to delays in transfer to CPS. *See, e.g., In re Folson*, Appeal Panel No. AP19-9153, Contempt Order, Dec. 2, 2021.

**E. Historical Efforts to Expand CPS Capacity**

76. CPS's population has expanded substantially over the last decade. (Fact Stip. ¶ 44.)

77. Expanding the physical capacity of CPS generally requires approval from the Minnesota legislature. (*Id*. ¶ 45.)

78. MSOP opened CPS in April 2009, in a three-bedroom, single-family home located on the St. Peter Campus, with two initial clients. (*Id.* ¶ 46.) Two additional clients were moved into the facility by the end of the year. (*Id.*) At the beginning of 2011, only 6 clients resided at CPS. (*Id*. ¶ 47.)

79. By 2013, the CPS population increased to 18 clients, and MSOP sought legislative funding to expand capacity. (*Id.*) MSOP added beds after a bonding request was approved during the 2014 legislative session. (*Id*.) From 2014 to 2015, CPS's population increased from 27 to 51 clients. (*Id.*)

80. In 2016, MSOP opened a 30-bed wing pursuant to the 2014 bonding request, increasing capacity to 89 beds. (*Id*.) A new bonding request to expand capacity was presented to the 2016 legislature but did not pass. (*Id*.)

81. In early 2017, DHS reported to the Legislature that its new 30-bed wing was already at capacity. (*Id*. ¶ 48.) But, again, a bonding request to expand CPS' capacity did not pass. (*Id*.) In early 2018, DHS reported to the Legislature that it could not transfer all clients with transfer orders and had a waitlist of approximately 30 clients. (*Id*.) DHS again pursued a bonding request during the 2018 legislative session, but it did not pass. (*Id*.)

82. In early 2019, DHS advised the Legislature that the CPS waitlist had grown to 36 clients and that additional funding was necessary to accommodate clients with active transfer orders. (*Id*. ¶ 49.) The Governor submitted a bonding request to the 2019 legislative session for funds to expand capacity at CPS. (*Id*.) This bonding request did not pass. (*Id.*)

83. In early 2020, DHS advised the Legislature that the CPS waitlist had grown to 42 clients and that additional bedspace was necessary to accommodate clients with active transfer orders. (*Id*. ¶ 50.) The Governor submitted a bonding request to the 2020 legislative session to expand capacity at CPS. (*Id*.) Also in 2020, DHS requested funding to expand CPS's capacity by an additional 50 beds and to make certain infrastructure changes. (*Id*.)

84. The legislature approved $1.8 million for the expansion of CPS, enough funding to increase CPS's capacity by 20 beds. (*Id*.)

85. Primary construction on this expansion was completed on December 22, 2021. (*Id*. ¶ 51.) On January 10, 2022, clients began moving into the CPS expansion, which is now full. (*Id*.)

86. In early 2021, DHS reported to the legislature that 49 clients were on the CPS waitlist and that additional funding was necessary to add beds and basic infrastructure. (*Id*. ¶ 52.) The legislature did not approve a 2021 bonding request intended to fund an additional 30 CPS beds. (*Id*. ¶ 53.)

87. In August 2022, MSOP took over a building called Bartlett Hall. (Tr. Vol. 1 at 63:7–10.) Acquiring Bartlett Hall and converting it into a CPS facility did not require legislative approval or funding. (*Id.* at 68:4–12; 190:6–25.) Bartlett Hall expanded the physical capacity of CPS to its present total capacity of 145 beds. (*Id.* at 63:7–10.)

88. In the 2023 legislative session, DHS submitted a bonding request to the legislature that was passed by both chambers and later approved by the Governor on June 1, 2023. (Fact Stip. ¶ 54.) Construction funded by this bonding bill is expected to be completed by the end of 2026. (*Id*.) The funding that allowed for this expansion did not cover the hiring of additional MSOP staff. (*Id.*)

89. MSOP's capacity at CPS is also limited by its staffing. (*See, e.g.,* Tr. Vol. 1 at 62:20–63:10, 170:4–172:24.)

90. MSOP has made hiring efforts including posting vacancies on several websites and social media, sending messages via LinkedIn, searching job boards, attending career fairs, and performing other kinds of advertising. (Fact Stip. ¶ 55.)

91. MSOP employee salaries are subject to statutory limits. (*Id*. ¶ 56.) Staff salaries and salary ranges are negotiated with the collective bargaining units that represent state employees. (*Id*.) MSOP offers certain hiring incentives, including eligibility for student loan and tuition reimbursement or signing bonuses. (*Id*.)

## CONCLUSIONS OF LAW

Plaintiffs advance one claim for violation of procedural due process (Count II). (See Second Am. Compl. ¶¶ 62–72.) At summary judgment, the Court concluded that this case is not moot and that Plaintiffs had established several of the elements of their due process claim as a matter of law. *See generally,* Summ. J. Order, 2025 WL 2636455. The Court reiterates those findings and conclusions and incorporates them here by reference.[5]

### I. MOOTNESS

1. The Court has jurisdiction over actual "Cases" or "Controversies." U.S. Const., art. III, § 2.

2. A case or controversy ceases to exist, and a case becomes moot, when "the issues presented are no longer live or the parties lack a cognizable interest in the outcome." *Brazil v. Ark. Dep't of Hum. Servs.*, 892 F.3d 957, 959 (8th Cir. 2018) (citation omitted).

3. A case is not moot when the challenged action is capable of repetition yet evading review. This occurs when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party [will] be subjected to the same action

[5] The Court will also deny Defendants' Motion for Judgment on Partial Findings under Fed. R. Civ. P. 52(c) which they brought (Tr. Vol. 1 at 155:23–25) and renewed (Tr. Vol. 2 at 279:10–13, June 29, 2026, Docket No. 220) during the bench trial.

again." *Whitfield v. Thurston*, 3 F.4th 1045, 1047 (2021) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).

4. Plaintiffs have demonstrated that the duration of their delay in transfer to CPS was too short to be fully litigated before they were eventually transferred. Summ. J. Order, 2025 WL 2636455, at *4.

5. Courts have applied the capable-of-repetition-yet-evading-review exception to conduct that has occurred over twelve months, *Turner v. Rogers*, 564 U.S. 431, 437, 440 (2011), and eighteen months, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 774–75 (1978).

6. It is undisputed that Plaintiffs were all transferred within six to ten months. (Fact Stip. ¶¶ 35–43.)

7. Thus, Plaintiffs meet the first element of the capable-of-repetition-yet-evading-review exception.

8. The Court further finds that Plaintiffs have a reasonable expectation to be subjected to the same action again because under Minnesota Statute, the MSOP Executive Director has the unilateral authority to revoke transfer at any time. (Tr. Vol. 1 at 76:7–12); Minn. Stat. § 253D.29, subd. 3(a); Summ. J. Order at *4.

9. Plaintiffs have also proven that Johnston has revoked individuals' CPS status, including Webber, during the pendency of this action. (Tr. Vol. 1 at 76:11–12; 200:20–23); *see also In re Steiner*, Appeal Panel No. AP24-9084, Jan. 27, 2026

(describing a revocation of transfer to CPS in November 2024). Webber must file a new petition for reduction in custody to be transferred back to CPS. (Tr. Vol. 1 at 200:24–201:1.)

10. If Webber were ordered to be transferred back to CPS, he would risk being placed on the waitlist again. (*Id*. at 201:2–5.) As of the date of trial, there was a waitlist of three people (*see* Tr. Vol. 1 at 192:14–16), and therefore, if the CAP ordered Plaintiff Webber transferred back to CPS tomorrow, he would almost certainly be placed back on the waitlist.

11. Further, Plaintiffs have proven that MSOP uses revocation as a threat when someone acts out at CPS, thereby creating an expectation of eventual revocation. (Tr. Vol. 1 at 31:22–24.)

12. For these reasons, this case is not moot.

## II. PROCEDURAL DUE PROCESS

13. To prove a procedural due process violation, a plaintiff must first establish that a protected liberty or property interest is at stake. *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 817 (8th Cir. 2011).

14. If a plaintiff establishes that he or she has been deprived of a protected liberty or property interest, then the Court then determines what process is due. *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006).

15. Individuals have a protectable liberty interest under state laws only when those laws "(1) place substantive limitations on the exercise of official discretion; and (2) contain explicit mandatory language comprising specific directives to the decision maker that if the regulations' substantive predicate acts are present, a particular outcome must follow." *William v. Nix*, 1 F.3d 712, 717 (8th Cir. 1993) (citation omitted) (internal quotation marks omitted).

16. A state law creates a protected liberty interest if the state statutes give "specific directives to the decision maker that if the [statute's] substantive predicates are present, a particular outcome must follow." Mot. Dismiss Order at *4 (quoting *Bagley v. Rogerson*, 5 F.3d 325, 328 (8th Cir. 1993)).

17. In *McDeid v. Johnston*, 984 N.W.2d 864 (Minn. 2023), the Minnesota Supreme Court reasoned that its own cases, alongside relevant Eighth Circuit cases, "establish relevant bedrock principles of law concerning the duty of public officials to follow court orders . . . [which] in combination with the Minnesota statutes governing reductions in custody . . . clearly established that compliance with a CAP transfer order must occur within a reasonable time." *Id.* at 879.

18. Shortly after this bench trial was complete, the Minnesota Court of Appeals held that holders of CAP transfer orders possess a constitutionally protected interest in being transferred to CPS in a reasonable time, and were deprived of that interest "when they were not transferred to CPS immediately after their CAP transfer

orders became effective." *McDeid v. Johnston,* Nos. A25-2082, A25-2083, 2026 WL 1972256, at *4 (Minn. App. July 6, 2026).

19. In this case, the Court has already concluded as a matter of law that "Plaintiffs have a protected liberty and property interest in being transferred to CPS within a reasonable amount of time" and "an unreasonable delay deprives them of that interest." Summ. J. Order, 2025 WL 2636455, at *5; *see also* Mot. Dismiss Order, 2023 WL 6318615, at *5 ("Based upon the [Minnesota Supreme Court's] *McDeid* holding, it is clear that MSOP patients have a protected liberty interest in the timely effectuation of their transfer orders. There are specific directives that if a certain predicate act is present (the existence of a valid CAP transfer order) then a particular outcome must follow (transfer to CPS within a reasonable time). Again, the MSOP does 'not have the discretion to ignore CAP transfer orders.' . . . Thus, MSOP patients have a liberty interest in being transferred to CPS that is subject to due process protections.").

20. The Court rejects Defendants' argument that the temporary inability to comply with a transfer order does not amount to a constitutional deprivation.

21. Plaintiffs have shown that a delay in transfer to CPS deprives them of additional liberties and treatment tailored towards their eventual discharge. (Tr. Vol. 1 at 27:5–30:15.)

22. Plaintiffs have further demonstrated that transfer to CPS is, generally speaking, a factual prerequisite for provisional or full discharge. (*See, e.g.*, Tr. Vol. 2 at 269:1–275:6, June 29, 2026, Docket No. 220.)

23. The Court's conclusions at Summary Judgment left only one issue for trial: "[W]hat constitutes a reasonable amount of time" to effectuate a transfer order. Summ. J. Order, 2025 WL 2636455, at *7.

24. Reasonableness is a question of fact to be determined by the Court based on the individual circumstances of the case. *Glacial Plains Coop. v. Chippewa Valley Ethanol Co.*, 912 N.W.2d 233, 237 (Minn. 2018); *McDeid*, 984 N.W.2d at 868.

25. Absent extraordinary circumstances, seven days is a reasonable amount of time to transfer an MSOP patient to CPS. *See* Summ. J. Order, 2025 WL 2636455, at *5.

26. The United States Supreme Court has stated that "it is fundamental that except in emergency situations . . . due process requires" the State to provide sufficient process before terminating a protected interest. *Bell v. Burson,* 402 U.S. 535, 542 (1971).

27. MSOP's consistent shortage of beds and staff are not extraordinary circumstances that excuse Defendants from effectuating transfer orders.

28. Since at least 2016, MSOP has experienced issues with lack of bed space and staffing. (*See, e.g.*, Tr. Vol. 1 at 54:12–24.)

29. Defendants possess the information necessary to estimate space and staffing needed at CPS for future years.

30. Lack of bed space or staffing at CPS is not unusual nor unpredictable, and Defendants' delay in effectuating Plaintiffs' transfer based on those reasons alone was not reasonable.

31. In this case, Plaintiffs were not transferred within a reasonable amount of time.

32. The Court concludes that it is unreasonable for a lack of staff alone to cause any delay in transfer beyond **seven** days.

33. The Court concludes it is unreasonable for a lack of bed space alone to cause any delay in transfer beyond **fourteen** days.

34. If a plaintiff establishes that he or she has been deprived of a protected interest, then the Court must next "consider what process is due by balancing the specific interest that was affected, the likelihood that the [MSOP] procedures would result in an erroneous deprivation, and the [MSOP's] interest in providing the process that it did, including the administrative costs and burdens of providing additional process." Summ. J. Order, 2025 WL 2636455, at *6 (quoting *Senty-Haugen*, 462 F.3d at 886).

35. Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances," *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976), but "is

flexible and calls for such procedural protections as the particular situation demands," *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

36. The Court again concludes, as it did at summary judgment, that MSOP provided Plaintiffs "no procedure at all to challenge the delay in transfer to CPS following a valid, effective transfer order" and that, if Plaintiffs were deprived of their protected interest, the lack of process constituted a violation of the Due Process Clause. Summ. J. Order, 2025 WL 2636455, at *7.

37. There is no mechanism for Plaintiffs to challenge their placement on the CPS waitlist. Contempt proceedings and data practices claims are not constitutionally sufficient process because procedural due process requires "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). *See* Summ. J. Order, 2025 WL 2636455, at *7.

38. Plaintiffs have proven by a preponderance of the evidence that they are entitled to some process through which they can challenge their placement on the waitlist and that Defendants provided no process.

**CONCLUSION**

Defendants violated Plaintiffs' right to procedural due process by failing to transfer them to Community Preparation Services within a reasonable amount of time following the issuance of a valid Commitment Appeal Panel transfer order without providing sufficient process. The Court acknowledges the multi-faceted challenges Defendants face

in ensuring that CPS is adequately staffed and has sufficient bedspace. But the Court concludes that any delay in transfer greater than seven days for staffing reasons alone is unreasonable, and that any delay greater than fourteen days for bedspace reasons alone is unreasonable. The Court will therefore enter judgment for Plaintiffs on Count Two of their Second Amended Complaint.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Judgment on Partial Findings under Fed. R. Civ. P. 52(c) is **DENIED**.
2. The Clerk of Court is **DIRECTED** to enter judgment for Plaintiffs on Count Two of Plaintiffs' Second Amended Complaint (Docket No. [136]).
3. Defendants' are **PERMANENTLY ENJOINED** from the challenged conduct depriving Plaintiffs of their right to procedural due process.

DATED: September 1, 2026
at Minneapolis, Minnesota.

/s/ John R. Tunheim
JOHN R. TUNHEIM
United States District Judge